**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MIR RAHMAN RAHMANI, *et al.*,                    :
                                                                       :
              Plaintiffs,                                      :          Civil Action No.:        24-0285 (RC)
                                                                       :
v.                                                                 :          Re Document No.:      11, 17, 24
                                                                       :
JANET YELLEN, Secretary of the Treasury,     :
*et al.*,                                                          :
                                                                       :
              Defendants.                                    :

<u>**MEMORANDUM OPINION**</u>

**GRANTING DEFENDANTS' PARTIAL MOTION TO DISMISS; DENYING PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION; DENYING PLAINTIFFS' MOTION TO STRIKE**

## I. INTRODUCTION

Mir Rahman Rahmani ("M. Rahmani"), Hafi Ajmal Rahmani ("A. Rahmani," and

together with M. Rahmani, the "Rahmanis"), along with over two dozen business entities (the

"Related Entities" and collectively with the Rahmanis, "Plaintiffs") filed the instant action on

January 31, 2024, against Secretary of the Treasury Janet Yellen, the United States Department

of the Treasury's Office of Foreign Assets Control ("OFAC") and its Director, Bradley Smith

(collectively, the "Treasury Defendants"), and against Secretary of State Antony J. Blinken

("State," and collectively with the Treasury Defendants, "Defendants").[1]  They brought suit

---

[1] The Related Entities are Ozean Immobilien Projektentwicklung Verwaltungs-GmbH,
Ozean Immobilien Management GmbH & Co. KG, Ozean Immobilien Projektentwicklung
GmbH & Co. KG, Pyramaxia Immoprojekt GmbH & Co. KG, Pyramaxia Real Estate
Development GmbH & Co. KG, Pyramaxia Real Estate GmbH & Co. KG, Ozean Group GmbH,
Ozean Baustoffe GmbH & Co. KG, Ozean Horizont Bauwerke GmbH, Ozean Horizont
Objektplanung GmbH & Co. KG, Ozean Horizont Projektentwicklungs GmbH & Co. KG, RG
Immoprojekt GmbH & Co. KG, RG Real Estate Development GmbH & Co. KG, RG Real Estate
GmbH & Co. KG, NAI Energy Europe GmbH & Co. KG, NAI Management GmbH, Pyramaxia
Limited, RG Holdings Limited, Buoyant Holdings Limited, Ocean Europe CY Limited, D.C.H.
Dream Creators Holdings LTD, Riseonic Holdings Limited, ZEM Holdings LTD, RG Group

because, on December 11, 2023, OFAC designated both Rahmanis as Specially Designated Nationals ("SDN") on the Specially Designated Nationals and Blocked Persons List ("SDN List"), claiming that the Rahmanis are responsible for a multi-part corruption scheme that misappropriated millions of dollars from U.S. government-funded contracts in Afghanistan. State concurrently designated the Rahmanis as being ineligible for entry into the United States.

Plaintiffs now seek a preliminary injunction against these designations, while Defendants move to dismiss in part.  Plaintiffs argue that they have a high likelihood of success on their claims that Defendants' actions are *ultra vires* and arbitrary and capricious in violation of the Administrative Procedure Act ("APA"), and that they will be irreparably harmed without an injunction.  Defendants disagree, arguing that the Treasury Defendants acted well within their statutory authority and that State's designations are non-reviewable, and also within statutory authority, and that Plaintiffs' claims should be dismissed.  And although Defendants do not move to dismiss Plaintiffs' claim that OFAC's designations are not sufficiently supported by a factual basis, they sharply contest this point when arguing against Plaintiffs' motion for a preliminary injunction.

Ultimately, the Court agrees with Defendants that the Treasury Defendants have acted within their authority, and dismisses the two counts asserting otherwise.  It also determines that Plaintiffs lack standing for two of their counts against State's designations and that the Court cannot review the other count against State, and dismisses these claims.  Moreover, the Court concludes that Plaintiffs have not shown a likelihood of success on the merits on the remaining

---

FZE, The Fern Limited, Ocean Estate Company Limited, Ocean Estate GmbH, Ocean Properties GmbH, and Ozean Real Estate GmbH & Co. KG.

count against the Treasury Defendants.  Thus, as set forth below, the Court will **GRANT**

Defendants' partial motion to dismiss and **DENY** Plaintiffs' motion for a preliminary injunction.

## II.  BACKGROUND

### A.  Statutory Background

1.  International Emergency Economic Power Act

In 1917, Congress enacted the Trading with the Enemy Act ("TWEA"), 50 U.S.C.A. § 1

*et seq.*, which gave the President authority to impose economic sanctions in response to both

peacetime emergencies and times of war.  *See Regan v. Wald*, 468 U.S. 222, 225–26 (1984).

While for decades TWEA provided the legal framework for economic sanctions, in 1977

Congress passed the International Emergency Economic Power Act ("IEEPA"), 50 U.S.C.

§ 1701 *et seq.*  IEEPA "limit[ed] the President's power to act pursuant to [TWEA] solely to times

of war."  *Wald*, 468 U.S. at 227.  However, it also gave the President "broad discretion" to

impose economic sanctions on foreign entities and individuals in the event of a national

emergency.  *See Fulmen Co. v. OFAC*, 547 F. Supp. 3d 13, 17 (D.D.C. 2020) (citing 50 U.S.C. §

1702(a)(1)(B)).  "The President may declare such a national emergency 'when an extraordinary

threat to the United States arises that originates in substantial part in a foreign state.'"  *Basengezi*

*v. Smith*, No. 23-cv-1249 (JEB), 2024 WL 1050340, at *1 (D.D.C. Mar. 11, 2024) (quoting *Holy*

*Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 159 (D.C. Cir. 2003)); *see also* 50

U.S.C. § 1701(a).  Once the President has declared a national emergency, IEEPA authorizes the

President to:

> [R]egulate, direct and compel, nullify, void, prevent or prohibit, any . . . transfer
> . . . of, or dealing in, or exercising any right, power, or privilege with respect to,
> or transactions involving, any property in which any foreign country or a national
> thereof has any interest . . . with respect to any property, subject to the jurisdiction
> of the United States[.]

50 U.S.C. § 1702(a)(1)(B).  This authority is "essentially the same" as the wartime powers

granted by TWEA.  *Wald*, 468 U.S. at 228.

### 2.  Global Magnitsky Act

In 2016, Congress passed the Global Magnitsky Human Rights Accountability Act

("Global Magnitsky Act"), which authorizes the President to deny entry into the United States,

revoke any already-issued visa, block interests in property under U.S. jurisdiction, and prohibit

U.S. persons from entering into transactions with, any foreign person identified as engaging in

human rights violations or corruption.  22 U.S.C. § 10101, *et seq.*  Regarding corruption, the Act

authorizes the President to impose sanctions on any foreign "government official, or a senior

associate of such an official," that the President determines is "responsible for, or complicit in,

ordering, controlling, or otherwise directing, acts of significant corruption, including the

expropriation of private or public assets for personal gain, corruption related to government

contracts or the extraction of natural resources, bribery, or the facilitation or transfer of the

proceeds of corruption to foreign jurisdictions."  22 U.S.C. § 10102(a)(3).  The Act also

authorizes the President to designate any foreign person who has "materially assisted, sponsored,

or provided financial, material, or technological support for, or goods or services in support of"

such corruption-supporting acts.  *Id.* § 10102(a)(4).  For each category of covered individuals,

the Act permits economic "blocking" sanctions "in accordance with" IEEPA, but it specifies that

the "national emergency requirement" for such sanctions under IEEPA does "not apply."  *Id.* §

10102(b)(2).

### 3.  Executive Order 13818

On December 20, 2017, the President issued Executive Order 13818 "[b]y the authority

vested in [the] President by the Constitution and the laws of the United States of America,

including the . . . IEEPA, . . . the Global Magnitsky Human Rights Accountability Act," and three other federal laws.  Exec. Order. No. 13,818, 82 Fed. Reg. 60839 (Dec. 26, 2017).  The order declared that "the prevalence and severity of human rights abuse and corruption that have their source, in whole or in substantial part, outside the United States . . . have reached such scope and gravity that they threaten the stability of international political and economic systems."  *Id.*  It further "determine[d] that serious human rights abuse and corruption around the world constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."  *Id.*  Consequently, "[t]he United States seeks to impose tangible and significant consequences on those who commit serious human rights abuse or engage in corruption, as well as to protect the financial system of the United States from abuse by these same persons."  *Id.*

Thus, the President declared a national emergency to counter these human rights abuse and corruption threats, blocking the property and interests in property of:

> (ii) any foreign person determined by the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General: . . .
>
> > (B) to be a current or former government official, or a person acting for or on behalf of such an official, who is responsible for or complicit in, or has directly or indirectly engaged in:
> >
> > > (1) corruption, including the misappropriation of state assets, the expropriation of private assets for personal gain, corruption related to government contracts or the extraction of natural resources, or bribery.

*Id.* § 1(a)(ii)(B)(1) (emphasis added).  Executive Order 13818 also authorized the Secretary of the Treasury, in consultation with the Secretary of State, "to take such actions, including adopting rules and regulations, and to employ all powers granted to [the President] by IEEPA and the [Global Magnitsky] Act as may be necessary to implement this order," and to re-delegate such functions as needed.  *Id.* § 8.  Subsequently, the Secretary of the Treasury delegated to the

Director of OFAC the authority to block persons under the Executive Order.  *See* 31 C.F.R. § 583.802.

Persons designated by OFAC pursuant to Executive Order 13818 (as well as other blocking authorities) are referred to as "Specially Designated Nationals or Blocked Persons", or SDNs.  OFAC maintains an "SDN List" of such individuals or entities whose assets are blocked. Once designated, an SDN may at any time "seek administrative reconsideration" of the designation or may "assert that the circumstances resulting in the designation no longer apply." *Id.* § 501.807.  In doing so, the SDN "may submit arguments or evidence that the person believes establishes that insufficient basis exists for the designation," and may also "propose remedial steps on the person's part . . . which the person believes would negate the basis for designation." *Id.* § 501.807(a).  Additionally, the SDN may request a meeting with OFAC.  *Id.* § 501.807(c). After conducting a review, OFAC will "provide a written decision" to the SDN.  *Id.* § 501.807(d).  OFAC's regulations do not limit the number of times a SDN may seek to challenge his designation administratively.  *See generally id.* § 501.807.

4. Section 7031(c) of the Department of State, Foreign Operations, and Related Programs Appropriations Act

Section 7031(c) of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2023 (Pub. L. No. 117-328, § 7031(c)(1)(A), 136 Stat. 5026 (2023)), as carried forward by the Continuing Appropriations Act, 2024 (Pub. L. No. 118-15, § 101(11), 137 Stat. 73 (2024)) ("Section 7031(c)," codified at 8 U.S.C. § 1182, statutory note) provides that "[o]fficials of foreign governments and their immediate family members" who the Secretary of State "has credible information have been involved" in "significant corruption" or "a gross

violation of human rights" "shall be ineligible for entry into the United States." [2]  Pub. L. No.

117-328, § 7031(c)(1)(A), 136 Stat. 5026 (2023); *see also* 8 U.S.C. § 1182, statutory note.  An

individual designated under Section 7031(c) is generally ineligible for a visa and admission into

the United States, barring narrow exceptions.  Pub. L. No. 117-328, § 7031(c)(1)(A), (c)(2)–(3),

136 Stat. 5026 (2023); *see also* 8 U.S.C. § 1182, statutory note.

### B.  Factual Background

In recounting the facts, the Court goes beyond the allegations in the complaint to more

fully explain the basis for resolving Plaintiffs' motion for a preliminary injunction.  *See, e.g.,*

Compl., ECF No. 1.  The Court notes, however, that Defendants' arguments for dismissal under

Rule 12(b)(6) do not address the factual sufficiency of the allegations but instead contend that

Plaintiffs have misidentified the appropriate legal framework or that Plaintiffs' claims are

otherwise precluded by law.  None of the additional facts from outside the complaint bear upon

the Court's Rule 12(b)(6) analysis.

#### 1.  Mir Rahman Rahmani

M. Rahmani was born in Bagram District, Parwan Province, Afghanistan.  M. Rahmani

Decl. ¶ 5, Pls.' Ex. 2, ECF No. 11-3.  In 1980, he became an officer in the Afghan Army.  *Id.*

After the first Taliban takeover of Afghanistan in 1996, he moved his family to Tajikistan but he

also joined the anti-Taliban resistance in Parwan Province.  *Id.* ¶ 6.  In 2001, he supported the

United States's military engagement in Afghanistan, Operating Enduring Freedom.  *Id.*  After the

---

[2] Congress initially authorized Section 7031(c) in Section 699L of the Fiscal Year 2008 annual appropriations act, requiring the Secretary to "compile and maintain a list of" designated officials.  Department of State, Foreign Operations, and Related Programs Appropriations Act, 2008, Pub. L. No. 110-161, div. J, tit. VI, § 699L, 121 Stat. 1844, 2373–74 (2007).  A version of this provision has been passed in every subsequent annual appropriations act for the Department of State.

fall of the Taliban-led government, M. Rahmani was reinstated in the Afghan Army and promoted to the rank of Brigadier General, and he was appointed to command the 40th Army Division based in Bagram, Parwan Province. *Id.* He held that command position until the unit's dissolution in 2004 as part of the United Nations-led national Disarmament, Demobilization and Reintegration program. *Id.* ¶ 7. During his command, M. Rahmani worked with U.S. military leadership and personnel based in Bagram Airfield, including on efforts to expand and develop the base, which served as the *de facto* headquarters of the U.S. military presence in Afghanistan. *Id.* After completion of the disarmament and reintegration program, M. Rahmani resigned from the Afghan Army and pursued private business opportunities. *Id.* ¶ 8.

In around 2005, M. Rahmani started a business buying and selling land and residential properties in Parwan and Kabul Provinces. *Id.* ¶ 9. At the same time, he was elected as Chairman of the Parwan Chamber of Commerce, an organization that sought to promote the interests of the business community in the province. *Id.*

In 2009, M. Rahmani resigned from the Chamber of Commerce and began organizing a campaign to run for a seat in the Wolesi Jirga, the lower house of Afghanistan's Parliament. *Id.* ¶ 11. In the 2010 parliamentary election, he was elected to the Wolesi Jirga, and began his term in 2011. *Id.* M. Rahmani was re-elected in the 2018 parliamentary election and began a second term in 2019. *Id.* ¶ 14. M. Rahmani states that both of his campaigns "were in full compliance with the election laws and regulations of Afghanistan" and that the elections were supervised by international observers and the United Nations, with the results confirmed by the Afghanistan Independent Election Commission and Election Complaints Commission. *Id.* ¶ 15. He asserts that his "campaigns and elections were not the subject of any allegation, dispute, controversy, or

investigation" by any government of Afghanistan agency, non-governmental organization, or international body.  *Id.*

In 2019, M. Rahmani emerged as the leading candidate for Speaker of the Wolesi Jirga, relying on a coalition of non-Pashtun ethnic groups who purportedly sought to elect a non-Pashtun Speaker to maintain ethnic balance in the leadership of the Afghan Government.  *Id.* ¶¶ 16–17, 18, 20.  After the fourth round of balloting, along predominately ethnic lines, M. Rahmani was elected Speaker for the 17th Wolesi Jirga.  *Id.* ¶ 18.  M. Rahmani states that during his time as a member of the Wolesi Jirga, including as Speaker, he did not own any shares of any company in Afghanistan and was not involved, directly or indirectly, in any businesses or with any entity that contracted with any government, including the Afghan Government or the U.S. Government.  *Id.* ¶¶ 27, 31.  M. Rahmani's tenure as Speaker ended on August 15, 2021, when the Taliban took over control of Afghanistan.  *Id.* ¶ 21.

Several years before 2021, amid security risks in Afghanistan, M. Rahmani decided to move his children out of Afghanistan and obtain citizenship in other countries.  *Id.* ¶ 36.  In 2015, he obtained citizenship in the country of St. Kitts and Nevis through a citizenship by investment program.  *Id.*  And in 2017, he obtained citizenship in the country of Cyprus through a citizenship by investment program, which created "additional safety and opportunity for [his] children and their education" because "Cyprus is a member of the European Union."  *Id.* ¶ 37. He currently resides in Turkey.  *Id.* ¶ 4.

### 2.  Haji Ajmal Rahmani

A. Rahmani is the son of M. Rahmani, and he was born in Bagram District, Parwan Province, Afghanistan.  A. Rahmani Decl. ¶ 5, Pls.' Ex. 3, ECF No. 11-4.  A. Rahmani lived in Tajikistan during the civil war in Afghanistan, graduating from high school in Tajikistan in 2001

and returning to Afghanistan in 2002 after the fall of the Taliban.  *Id.* ¶¶ 6–7.  A. Rahmani initially worked as a translator with the U.S. military, but then became a contractor providing trucking and fuel services to the U.S. military and NATO forces throughout Afghanistan, including through his company Northern Afghanistan Logistic Services ("NALS").  *Id.* ¶¶ 8–10. However, according to A. Rahmani, he has "not had any interest in any company in Afghanistan since July 2016," including NALS.  *Id.* ¶¶ 25–26.

In 2018, A. Rahmani ran for the Wolesi Jirga.  *Id.* ¶ 39.  He won his election and took office in 2019.  A. Rahmani Supp. Decl. ¶ 4, ECF No. 19-1.  A. Rahmani states that he "had already ceased all government contracting with the U.S. Government and [the Afghan Government]" by the time he ran for office, and furthermore, that he had "divested all interests in companies registered in Afghanistan and cut other business ties to Afghanistan."  A. Rahmani Decl. ¶ 40.  He also says that his "campaign was in full compliance with the election laws and regulations of Afghanistan" and was conducted without payment or promises of payment in exchange for votes.  *Id.* ¶¶ 41, 43.  Like his father, A. Rahmani left office when the Taliban took over Afghanistan in 2021.  A. Rahmani Supp. Decl. ¶ 4.

In or around 2008, A. Rahmani began making investments outside of Afghanistan.  A. Rahmani Decl. ¶¶ 22–24.  He obtained St. Kitts and Nevis citizenship in 2009, and moved his family to the UAE in 2010 out of concern for their safety in Afghanistan.  *Id.* ¶¶ 52–53.  In 2014, A. Rahmani obtained a citizenship by investment from Cyprus, and began investing in Europe. *Id.* ¶ 54.  He currently resides in the United Arab Emirates, where his residency is tied to his Cypriot citizenship.  *Id.* ¶ 4; A. Rahmani Supp. Decl. ¶ 8.

### 3. OFAC and State Designations

On December 11, 2023, OFAC announced in a press release that it was designating the Rahmanis pursuant to Executive Order 13818 "for their extensive roles in transnational corruption."  *See* U.S. Dep't of the Treasury, *Treasury Targets Transnational Corruption* (Dec. 11, 2023) ("Press Release"), https://home.treasury.gov/news/press-releases/jy1973 (last accessed April 18, 2024).  As a result of this designation, "all property and interests in property of the [Rahmanis] that are in the United States or in the possession or control of U.S. persons are blocked and must be reported to OFAC." *Id.*  "OFAC's regulations generally prohibit all transactions by U.S. persons or within (or transiting) the United States that involve any property or interests in property of designated or otherwise blocked persons." *Id.*  Additionally, "financial institutions and other persons that engage in certain transactions or activities with the sanctioned entities and individuals may expose themselves to sanctions or be subject to an enforcement action." *Id.*

OFAC's Press Release alleged that the Rahmanis had "perpetrated a complex procurement corruption scheme resulting in the misappropriation of millions of dollars from U.S. Government-funded contracts that supported Afghan security forces." *Id.*  According to OFAC, this four-part scheme focused on fuel procurement for the Afghan National Defense and Security Forces. *Id.*  First, the Rahmanis "artificially inflated the price of fuel contracts they won to deliver fuel to Afghan security forces . . . by fraudulently submitting contract bids from multiple companies that obscured their involvement, rigging bids, and eliminating competition on U.S.-funded contracts." *Id.*  Second, the Rahmanis engaged in import tax fraud by bribing Afghan customs officials for letters that allowed the Rahmanis' companies to over-import fuel tax free,

"potentially robb[ing] the Afghan government of millions of dollars in tax revenue." [3]  *Id.*  Third, the Rahmanis "bolstered their corrupt fuel profits by under-delivering on their companies' fuel contracts," and bribed Afghan army personnel to conceal non-delivery of fuel.  *Id.*  Fourth, the Rahmanis paid voters for votes, bribed Afghan election officials to inflate the results of A. Rahmani's election victory, and M. Rahmani paid members of the Wolesi Jirga to support his bid for Speaker.  *Id.*

OFAC also described the Rahmanis as having an "international corporate network" and portrayed their acquisition of foreign citizenships as a way to conduct international business.  *Id.* Accordingly, OFAC designated "44 associated entities" across several different countries because they are owned or controlled by A. Rahmani.[4]  *Id.*  Finally, OFAC explained that it conducted its investigation in "close coordination with the Office of the Special Inspector General for Afghanistan Reconstruction," a U.S. agency created to provide oversight of Afghanistan reconstruction projects and activities.  *Id.*

Concurrently with the OFAC designation, State announced entry restrictions on the Rahmanis under Section 7031(c).  *See* U.S. Dep't of State, *Leveraging Tools to Promote Accountability and Counter Global Corruption* (Dec. 11, 2023), https://www.state.gov/leveraging-tools-to-promote-accountability-and-counter-global-corruption/ (last accessed Apr. 18, 2024).  State's announcement stated that the Rahmanis were being designated in conjunction with OFAC's designation "for their involvement in significant corruption."  *Id.*  State also designated the Rahmanis' immediate family members.  *Id.*

---

[3] The Court notes that M. Rahmani disputes the premise that he was involved in the companies.  The Court recounts the language used by OFAC without necessarily accepting the accuracy of those statements.

[4] The Rahmanis brought suit alongside some of these entities—the Related Entities—but not all.  They allege that the omitted entities are not related to them.  Compl. ¶ 29 n.1.

The Rahmanis sharply contest OFAC and State's conclusions and designations.  A. Rahmani denies that he ever participated in any of the alleged schemes regarding corrupt contract rigging, tax fraud, and underdelivery of fuel.  A. Rahmani Decl. ¶ 49.  A. Rahmani claims he was not doing any type of business in Afghanistan after July 2016, *id.* ¶ 26, contradicting OFAC's assertions that his companies committed import fraud in 2017, 2018, and 2019, *see Press Release*.  The Rahmanis dispute that they ever made payments for votes or payments to election officials, or that they otherwise violated election laws.  A. Rahmani Decl. ¶ 49(j); M. Rahmani Decl. ¶ 48.  They also contend that some of the entities sanctioned by OFAC are not owned or controlled by either Rahmani, including Fidelis Logistics and Supply Services and Secure Movement Logistics Services.  M. Rahmani Decl. ¶ 47; A. Rahmani Decl. ¶¶ 27, 49(h)-(i).  M. Rahmani insists he was never involved in any type of fuel contracts.  M. Rahmani Decl. ¶¶ 44–47.  Indeed, both Rahmanis attest that M. Rahmani has "never owned any shares or interests in any of" A. Rahmani's companies and "never been involved or participated in any manner" in these businesses.  M. Rahmani Decl. ¶ 33; A. Rahmani Decl. ¶ 49(l).  Finally, the Rahmanis say that their citizenship in St. Kitts and Nevis, and in Cyprus, was obtained in full compliance with the law and reject any suggestions of impropriety in pursuing those citizenships. M. Rahmani Decl. ¶ 49; A. Rahmani Decl. ¶¶ 51–54.

The Rahmanis allege that they have suffered considerable harm due to the designations, including severe damage to their reputations.  M. Rahmani Decl. ¶¶ 50–52; A. Rahmani Decl. ¶¶ 55–57.  Many of A. Rahmani's business licenses have been suspended or cancelled, and the pending loss of a business license in the United Arab Emirates on April 22, 2024 because of the OFAC designation will also lead to the loss of his and his family's residency visas tied to that business license.  A. Rahmani Supp. Decl. ¶ 7–9.  A. Rahmani has also lost access to his bank

accounts in the United Arab Emirates and his companies cannot pay their employees.  *Id.* ¶ 10.

Additionally, A. Rahmani asserts that the OFAC SDN designation has substantially harmed his

business interests in Germany and Cyprus, including cancelled leases, suspended real estate

projects, terminated contracts, and closed bank accounts.  A. Rahmani Supp. Decl. ¶¶ 12–14.

The Rahmanis also say that the OFAC designation has physically endangered them, their

families, and their employees.  M. Rahmani Decl. ¶ 52; A. Rahmani Supp. Decl. ¶¶ 15–17.

Relatedly, the Rahmanis state that they could face the loss of their citizenships in St. Kitts and

Nevis and in Cyprus, because the Press Release alleges that those citizenships were obtained for

improper purposes.  M. Rahmani Decl. ¶ 52; A. Rahmani Decl. ¶¶ 57–58.  They say that if

forced to return to Afghanistan, they would face persecution and possibly death at the hands of

the Taliban.  M. Rahmani Decl. ¶ 52; A. Rahmani Decl. ¶ 58.  However, unlike with A.

Rahmani's United Arab Emirates residency, the Rahmanis do not present details of any inquiries

or proceedings about their citizenships.  M. Rahmani Decl. ¶ 52; A. Rahmani Decl. ¶ 57.

### 4.  Procedural History

On December 21, 2023, Plaintiffs, through counsel, requested the administrative record

underlying their designations. Compl. ¶ 6.  Then, on January 31, 2024, Plaintiffs filed this

lawsuit.  *See id.*  The complaint alleges that the OFAC and State designations were *ultra vire*s

(Counts I and II respectively); "in excess of" OFAC's and State's "statutory jurisdiction,

authority, or limitations" and thus unlawful under the APA, 5 U.S.C. § 706(2)(C) (Counts III and

IV respectively); and unsupported by a sufficient factual basis and thus "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law" under the APA, *id.* § 706(2)(A)

(Count V), *see generally* Compl.

On February 20, 2024, Plaintiffs filed a motion for a preliminary injunction enjoining the designations.  *See* Pls.' Mem. Supp. Mot. Prelim. Inj. ("Pls.' PI Mot."), ECF No. 11-1. Defendants have opposed the motion, *see* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. ("Defs.' PI Opp'n"), ECF No. 18, and Plaintiffs have filed a reply, *see* Reply Mem. Supp. Pls.' Mot. Prelim. Inj. ("Pls.' PI Reply"), ECF No. 19.  The Court heard oral argument on March 19, 2024 to consider the parties' positions on the preliminary injunction.

In addition, on March 22, 2024, Defendants "provide[d] notice that the Government [was] lodging for submission classified and protected information . . . in connection with the Court's consideration of Plaintiffs' Motion for Preliminary Injunction," along with a supporting declaration as to the validity of that information.  Defs.' Notice of Lodging, ECF No. 23.  The same day, Plaintiffs moved to strike the notice.  *See* Pls.' Mem. P&A Supp. Mot. Strike Defs.' Notice of Lodging and Supporting Decl. ("Pls.' Mot. Strike"), ECF No. 24-1.  Defendants responded, and Plaintiffs filed a reply.  Defs.' Opp'n Pls.' Mot. Strike ("Defs.' Opp'n Mot. Strike"), ECF No. 29; Pls.' Reply Mem. P&A Supp. Mot. Strike Defs.' Notice of Lodging and Supporting Decl. ("Pls.' Reply Mot. Strike"), ECF No. 31.

In addition to the briefing on the motion for a preliminary injunction, on March 5, 2024, Defendants filed a motion to dismiss Counts I through IV, and Count V as it pertains to State. Defs.' Mem. Supp. Partial Mot. Dismiss ("Defs.' MTD"), ECF No. 17-1.  Plaintiffs oppose the motion.  Pls.' Mem. P&A Opp'n. Defs.' Partial Mot. Dismiss, ECF No. 20 ("Pls.' Opp'n MTD").  Defendants replied, and with the consent of Defendants and approval from the Court, Plaintiffs filed a sur-reply.  Defs.' Reply Supp. Partial Mot. Dismiss, ECF No. 27 ("Defs.' MTD Reply"); Pls.' Sur-reply Mem. P&A Opp'n Defs.' Partial Mot. Dismiss, ECF No. 30 ("Pls.' Sur-reply MTD").  All the aforementioned motions are now fully briefed and ripe for decision.

### III.  LEGAL STANDARDS

### A.  Rule 12(b)(1)

To survive a motion to dismiss under Rule 12(b)(1), the plaintiff has the burden of proving that the Court has subject-matter jurisdiction to hear his claims.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  As part of subject-matter jurisdiction, the plaintiff must show that he has standing to sue, which is "an 'essential and unchanging' predicate to any exercise of [the Court's] jurisdiction."  *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (quoting *Lujan*, 504 U.S. at 560).  To establish "[t]he 'irreducible constitutional minimum'" of standing, "(i) the party must have suffered a concrete and particularized injury in fact, (ii) that was caused by or is fairly traceable to the actions of the defendant, and (iii) is capable of resolution and likely to be redressed by judicial decision."  *Sierra Club v. EPA*, 755 F.3d 968, 973 (D.C. Cir. 2014) (citing *Lujan*, 504 U.S. at 560–61).  Further, a "plaintiff must demonstrate standing separately for each form of relief sought."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 185 (2000).  Regardless of whether a defendant raises standing issues, a court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."  *Grand Lodge of the Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).

### B.  Rule 12(b)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim or complaint" by asking whether the plaintiff has properly stated a claim for which relief can be granted.  *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 344 (D.C. Cir. 2018).  In considering such a motion, the complaint must be construed "liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged . . . ."

*Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006) (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).  But a court may disregard "inferences drawn by a plaintiff if such inferences are unsupported by the facts set out in the complaint." *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (quoting *Kowal*, 16 F.3d at 1276) (brackets omitted).

Thus, although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a motion to dismiss.  *Id.*  Similarly, there is no obligation to accept plaintiff's legal conclusions as true, nor to presume the truth of legal conclusions that are couched as factual allegations.  *See Twombly*, 550 U.S. at 555.  Also, the Court may consider "any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice."  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

Moreover, while justiciability issues are often decided as jurisdictional questions under Rule 12(b)(1), "certain justiciability questions are governed by Rule 12(b)(6), rather than Rule 12(b)(1)[.]"  *Matthew A. Goldstein, PLLC v. U.S. Dep't of State*, 153 F. Supp. 3d 319, 331 n.9 (D.D.C. 2016) (citations omitted), *aff'd*, 851 F.3d 1 (D.C. Cir. 2017) (citing *Sierra Club v. Jackson*, 648 F.3d 848, 853 (D.C. Cir. 2011)).  The D.C. Circuit has acknowledged that it "ha[s] not always been consistent in maintaining the distinction between a claim that is not justiciable . . . and a claim over which the court lacks subject matter jurisdiction."  *Id.* (quoting

*Sierra Club*, 648 F.3d at 853) (internal quotation marks omitted).  Most relevantly here, while

the D.C. Circuit previously used the word "jurisdiction" when describing the doctrine of consular

nonreviewability, it has more recently clarified that doctrine is not jurisdictional and thus falls

under the ambit of Rule 12(b)(6).  *Baan Rao Thai Rest. v. Pompeo*, 985 F.3d 1020, 1028 (D.C.

Cir. 2021).

### C.  Preliminary Injunction

A preliminary injunction is "'an extraordinary remedy that may only be awarded upon a

clear showing that the [movant] is entitled to such relief.'"  *John Doe Co. v. Consumer Fin. Prot.*

*Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017) (alteration in original) (quoting *Winter v. Natural*

*Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  "A plaintiff seeking a preliminary injunction

must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer

irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his

favor, and [(4)] that an injunction is in the public interest."  *Winter*, 555 U.S. at 20; *see also*

*League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016).  When "the

Government is the opposing party," the determination of the third and fourth factors regarding

"harm to the opposing party" and "the public interest" merge.  *Nken v. Holder*, 556 U.S. 418,

435 (2009).

Of the factors, likelihood of success on the merits and irreparable harm are particularly

crucial, and a court "may deny a motion for preliminary injunction, without further inquiry, upon

finding that a plaintiff is unable to show *either* irreparable injury or a likelihood of success on the

merits."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C.

2016) (noting that "a failure to show a likelihood of success on the merits alone is sufficient to

defeat a preliminary-injunction motion") (emphasis in original); *see also Ark. Dairy Co-op*

*Ass'n, Inc. v. USDA*, 573 F.3d 815, 832 (D.C. Cir. 2009) (same).  And even if the movant can

make an independent showing of the first two factors, relief does not issue automatically.

Rather, as the third and fourth factors suggest, a preliminary injunction is an equitable remedy

committed to the court's "sound discretion."  *Winter*, 555 U.S. at 24 (quoting *Weinberger v.

Romero-Barcelo*, 456 U.S. 305, 312 (1982)).  Finally, the D.C. Circuit "has rejected any

distinction between a mandatory and prohibitory injunction" in terms of the burden of

persuasion, as the "mandatory injunction has not yet been devised that could not be stated in

prohibitory terms."  *League of Women Voters*, 838 F.3d at 7 (quoting *United States v. W. Elec.

Co.*, 46 F.3d 1198, 1206 (D.C. Cir. 1995)) (internal quotation marks omitted).

## IV.  ANALYSIS

To proceed, the Court will begin with Defendants' motion to dismiss Counts I through

IV, and Count V as it pertains to State.  The Court will first analyze Plaintiffs' claim that

OFAC's actions are *ultra vires* or in excess of statutory authority, and concludes that those

claims should be dismissed.  After that, the Court will turn to Plaintiffs' similar argument that

State's actions are *ultra vires* or in excess of statutory authority, and concludes that the claims

against State should also be dismissed.  At that stage, having granted Defendants' motion to

partially dismiss, the Court considers whether to grant a preliminary injunction corresponding to

Plaintiffs' arbitrary and capricious claim against the Treasury Defendants.  In that analysis, the

Court determines that Plaintiffs have not shown a likelihood of success on the merits, and

therefore that a preliminary injunction is unwarranted.

## A.  OFAC Acted Within Its Statutory Authority When Sanctioning Plaintiffs Under IEEPA

In Counts I and III, Plaintiffs contend that the OFAC sanctions are *ultra vires,* and

unlawful under the APA, because the Global Magnitsky Act allows sanctions against current

government officials, not former officials like the Rahmanis.  Pls.' PI Mot. at 23; *see* Compl. ¶¶ 76–79, 88–90.  As a textual manner, Plaintiffs' argument is straightforward.  The Global Magnitsky Act provides that sanctions may be issued against a foreign person who "*is* a government official, or a senior associate of such an official."  22 U.S.C. § 10102(a)(3) (emphasis added).  Plaintiffs assert that the plain language of the Global Magnitsky Act uses the present tense "is," meaning that the Act has no reach over former officials.  *See* Pls.' PI Mot. at 25.  Plaintiffs also introduce legislative history that purportedly supports their textual interpretation.  *Id.* at 25–26.

Defendants directly respond to these arguments on the meaning and scope of the Global Magnitsky Act, but they also raise as a counterargument that the Court need not interpret the Global Magnitsky Act at all because IEEPA provides an independent and adequate basis for the sanctions against Plaintiffs.  *See* Defs.' MTD at 20.  Defendants highlight that OFAC's announcement of the designations said that they were made "pursuant to" Executive Order 13818.  *See* Press Release.  In turn, that Executive Order relied on the Global Magnitsky Act *and* IEEPA.  *See* Exec. Order 13,818, 82 Fed. Reg. 60839 (Dec. 26, 2017).  According to Defendants, because OFAC was exercising broad authority under IEEPA, it is irrelevant whether OFAC's designations would be permissible under the Global Magnitsky Act alone.  Defs.' MTD at 19–21.

The Court agrees with Defendants that interpreting the Global Magnitsky Act is unnecessary if IEEPA provides sufficient authority for the sanctions against the Rahmanis.  While OFAC's press release did not directly refer to IEEPA—and did mention the Global Magnitsky Act—it did identify Executive Order 13818 as providing authority for the designations.  *See* Press Release.  Thus, Executive Order 13818 is the starting point for assessing

the lawfulness of OFAC's conduct.  *See OFAC v. Voices in Wilderness*, 329 F. Supp. 2d 71, 77 (D.D.C. 2004); *see also, e.g., United States v. Tajideen*, 319 F. Supp. 3d 445, 454–56 (D.D.C. 2018) (requiring consideration of "plain language" of executive order on which OFAC relied). Executive Order 13818 specifically references IEEPA when declaring a national emergency to address serious foreign corruption threats and human rights abuses, and permitted OFAC to designate both "current" and "former" government officials responsible for such threats.  *See* Exec. Order 13,818 § 1(ii)(B), 82 Fed. Reg. 60839 (Dec. 26, 2017).  Accordingly, Plaintiffs are incorrect to say that the Global Magnitsky Act is the sole relevant source of authority for the designations, *see* Pls.' PI Reply at 10, and so IEEPA may render Plaintiffs' arguments regarding the Global Magnitsky Act irrelevant.

As explained above, IEEPA gives the Executive Branch "broad discretion to sanction foreign entities and individuals in the event there is a national emergency."  *Fulmen*, 547 F. Supp. 3d at 17; *see also Olenga v. Gacki*, 507 F. Supp. 3d 260, 281 (D.D.C. 2020) ("[T]he President has broad authority under IEEPA and could reasonably conclude that the deterrence of international bad actors . . . at times . . . requires the imposition of sanctions on those who have retired or moved on to other pursuits.").  Consequently, Defendants argue that Executive Order 13818—and by extension, the sanctions on the Rahmanis—is a lawful exercise of that discretion. *See* Defs.' MTD at 19–21.

Plaintiffs respond that "Congress enacted IEEPA . . . to curb, not expand, the invocation of presidential emergency powers."  Pls.' Opp'n MTD at 22.  In making this argument, Plaintiffs cite legislative history indicating that IEEPA was intended to limit the authority provided in the TWEA.  *See id.* at 22–23*;* H.R. Rep. No. 95-459, "Trading With The Enemy Act Reform Legislation," at 2 (1977) (stating that IEEPA "confers upon the President a new set of authorities

for use in time of national emergency which are both more limited in scope than those of section 5(b) [of the TWEA] and subject to various procedural limitations"); S. Rep. No. 95-466 (1977) ("The purpose of the bill is to revise and delimit the President's authority to regulate international economic transactions during wars or national emergencies.").  Plaintiffs also say that IEEPA was intended to be used for emergencies that "are by their nature rare and brief, and are not to be equated with normal ongoing problems."  Pls.' Opp'n MTD at 24 (quoting Christopher A. Casey et al., Cong. Rsch. Serv., R45618, The International Emergency Economic Powers Act: Origins, Evolution and Use, Congressional Research Service 2 (2024) ("CRS IEEPA Rep.").[5]

But Plaintiffs' attempt to use legislative history to narrow the reach of IEEPA is not compelling when, as Defendants note, the President has declared "dozens of IEEPA national emergencies and authorized sanctions to address all manner of threats—ranging from narcotrafficking to political repression to malicious cyberactivity to corruption."  Defs.' MTD Reply at 7 (citing CRS IEEPA Rep at 66–87).  And Courts regularly uphold these sanctions. *See, e.g.*, *Fulmen*, 547 F. Supp. 3d at 25; *OKKO Bus. PE v. Lew*, 133 F. Supp. 3d 17, 27 (D.D.C. 2015).  In other words, the Court agrees with Defendants that the President's "sweeping" and "broad" authority under IEEPA is settled.  *Dames & Moore v. Regan*, 453 U.S. 654, 671, 678 (1981) (quotation marks omitted); *see also Regan*, 468 U.S. at 225, 228 (noting that with IEEPA, Congress took the "broad" presidential authority to impose wartime sanctions and extended this authority to "peacetime crises"); *United States v. Three Sums Totaling $612,168.23 in Seized*

---

[5] Plaintiffs cite *Wisconsin Project on Nuclear Arms Control v. U.S. Dep't. of Commerce*, 317 F.3d 275, 278 (D.D.C. 2003) for the proposition that "IEEPA's legislative history is reflected in H.R. Rep. No. 95-459 (1977)[,] . . . that no Conference Report exists[,] and the Senate Report is silent on the point under consideration."  *See* Pls.' Opp'n MTD at 24 n.15.

*U.S. Currency*, 55 F.4th 932, 935 (D.C. Cir. 2022) (explaining that IEEPA "vests the President with sweeping authority").

Plaintiffs also say that IEEPA's authority can only be exercised "to deal with any unusual and extraordinary threat . . . if the President declares a national emergency with respect to such threat."  Pls.' Opp'n MTD at 23 (quoting 50 U.S.C. § 1701).  In light of this requirement, Plaintiffs argue that it is insufficient for Executive Order 13818 to "simply parrot[] the words 'unusual and extraordinary threat,'" Pls.' PI Reply at 12, without identifying how global corruption creates a crisis for the United States.  But Plaintiffs do not say more to explain how Executive Order 13818 represents impermissible "unbounded discretion" to the President, or to contradict the order's conclusions about the dangers of global corruption.  Pls.' Opp'n MTD. at 23; *see* Pls.' PI Reply at 12.

In fact, a President's national emergency declaration under IEEPA is action taken pursuant to specific congressional authorization, and thus is "supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it."  *Dames & Moore*, 453 U.S. at 668 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)); *see also Karadzic v. Gacki*, 602 F. Supp. 3d 103, 111 (D.D.C. 2022) (explaining that a decision made in an executive order "receives heightened deference because this executive order involves national security and foreign affairs").  Executive Order 13818 provides a detailed description of how and why global "human rights abuse and corruption" constitute an unusual and extraordinary threat, and thus are a national emergency.  *See* Exec. Order 13,818, 82 Fed. Reg. 60839 (Dec. 26, 2017) (explaining that human rights abuses and corruption "threaten the stability

of international political and economic systems").  Plaintiffs offer no reason to second-guess the President's conclusions, and the Court will not do so here.

At most, Plaintiffs cite *Islamic Am. Relief Agency v. Unidentified FBI Agents*, where the district court held that "following the September 11, 2001 attacks, there was clearly a basis for the President's finding of an unusual and extraordinary threat, and this finding comports with the requirements of 50 U.S.C. § 1701.  Accordingly, the President properly exercised the powers granted to him under the IEEPA."  394 F. Supp. 2d 34, 46 (D.D.C. 2005).  On appeal, the D.C. Circuit affirmed the district court in part and remanded in part, but did not address whether there was an adequate basis for the President's finding of a threat sufficient to create a national emergency.  *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 735 (D.C. Cir. 2007).  Plaintiffs cite these cases for the implication in the district court's opinion that a President could declare an IEEPA emergency that is not supported by a sufficient factual basis.  *See* Pls.' Opp'n MTD at 25.  That implication is insufficient to help Plaintiffs here, who do not offer *any* reasons to question the accuracy of Executive Order 13818's determinations about global corruption.

Returning to the Global Magnitsky Act, Plaintiffs also argue that the Global Magnitsky Act narrows IEEPA's reach and prevents the President from imposing corruption-related sanctions.  Pls.' Opp'n MTD at 21–22.  Plaintiffs' argument fails once more.  Plaintiffs rely on the canons of construction positing that "[w]hen statutes intersect, the specific statutes . . . trump the general . . . '[t]hat is particularly true where . . . Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.'"  *Id.* (quoting *Loving v. IRS*, 917 F. Supp. 2d 67, 77 (D.D.C. 2013)).  But that canon applies only when the two statutes are "irreconcilably conflicting"; when they are not, courts have a "duty to harmonize the

provisions and render each effective." *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 698–99 (D.C. Cir. 2014).

The Global Magnitsky Act does not irreconcilably conflict with IEEPA. The Global Magnitsky Act explicitly references IEEPA and establishes that the range of blocking actions available under IEEPA are also available under the Act but that IEEPA's "national emergency requirement" does not apply. 22 U.S.C. § 10102(b)(2). Section 10102(b)(2) does not limit the scope of IEEPA; rather the provision contemplates that IEEPA will remain in force and demonstrates that Congress consciously chose not to limit or displace it. In other words, the Global Magnitsky Act did not remove corruption from the scope of potential emergencies covered by IEEPA. Moreover, IEEPA and the Global Magnitsky Act coexist without a problem as separate regimes for imposing sanctions, even though Executive Order 13818 causes those statutes to "overlap." *See Adirondack Med. Ctr.*, 740 F.3d at 699; *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) ("Redundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws, a court must give effect to both.") (citation omitted). Reading the two statutes in harmony, the Court concludes that the Global Magnitsky Act does not narrow or limit the President's authority under IEEPA by removing corruption as a reason for sanctions. *See Me. Cmty. Health Options v. United States*, 590 U.S. 296, 315 (2020) (explaining that "repeals by implication are not favored . . . and are a rarity") (citation omitted).

Finally, the Global Magnitsky Act also does not limit the imposition of sanctions for corruption under IEEPA to individuals who are currently government officials. *See* Pls.' Opp'n MTD at 26–27 (arguing that through the Global Magnitsky Act, Congress made a "policy choice to limit corruption-based sanctions to those *who are current government officials*") (emphasis

added).  Even assuming Plaintiffs are correct that the Global Magnitsky Act allows sanctions

only on current government officials, they have provided no reason to believe that this

requirement is anything other than an additional point of differentiation between separate

statutory sanctions tools available to the President.  In other words, even if sanctions under the

Global Magnitsky Act are limited to current government officials, the Court sees no reason to

conclude that sanctions under IEEPA are limited in that manner.

In summary, IEEPA and Executive Order 13818 provide an independent basis for the

sanctions imposed on the Rahmanis.  Thus, the Court need not interpret the Global Magnitsky

Act.  The Court will dismiss Counts I and III.

Before moving on, the Court notes that Defendants also argue that Plaintiffs' *ultra vires*

claim against the Treasury Defendants is "nonjusticiable because Plaintiffs can and do bring a

duplicative APA claim under 5 U.S.C. § 706(2)(C) to challenge OFAC's sanctions as allegedly

in excess of its statutory authority."  Defs.' MTD Reply at 15.  The Court's conclusions about the

scope of IEEPA and Executive Order 13818 render resolution of Defendants' justiciability

argument unnecessary.

### B.  Plaintiffs Are Without Standing to Bring Some Claims Against State, and the Remaining Claim is Not Reviewable

In an echo of their Global Magnitsky Act arguments, Plaintiffs assert that Section 7031(c)

does not apply to former government officials, and thus that State acted *ultra vires* and without

authority when imposing visa and entrance restrictions on the Rahmanis and their immediate

relatives.  Pls.' PI Mot. at 4, 17, 22.  They also argue that, even if the Rahmanis do fall under

Section 7031(c), the designations are based on false information.  *Id.* at 32.  Section 7031(c)

provides that the Secretary of State may designate "[o]fficials of foreign governments and their

immediate family members" as "ineligible for entry into the United States" based on "credible

information" of involvement "in significant corruption."  8 U.S.C. § 1182, statutory note.

Plaintiffs contend that because this language does not include the word "former," it applies only

to current government officials and not former officials like the Rahmanis.  *See* Pls.' PI Mot. at

30.  Defendants counter this statutory construction argument on its own terms.  Defs.' MTD at

38–41.  However, they primarily argue that the Court need not interpret the statute at all because

Section 7031(c) claims are not justiciable.  *Id.* at 26–31.  As explained below, the Court does not

reach the merits of Plaintiffs' statutory construction argument about Section 7031(c) because

plaintiff either lacks standing to challenge State's conduct or that conduct is not reviewable.

### 1.  Plaintiffs Lack Standing to Bring Counts II and IV

The Court "has an independent obligation to assure that standing exists, regardless of

whether it is challenged by any of the parties."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 499

(2009).  Standing is not "dispensed in gross," and, accordingly, a plaintiff must have standing for

each claim "he seeks to press and for each form of relief that is sought."  *See Davis v. FEC*, 554

U.S. 724, 734 (2008) (internal quotation marks and citation omitted).

Defendants do not address the Rahmanis' standing in their motion to dismiss.  Yet, as

Defendants observe, the "only mandatory repercussion that flows from State's 7031(c)

determination is that the designated official generally cannot enter the United States—that is, he

or she is presumptively ineligible for a visa."  Defs.' MTD Reply at 20.  Here, the Rahmanis

have not alleged that they (or their immediate family members) have any intention of travelling

to the United States, whether concrete plans or even a mere aspirational desire. [6]  They do not

allege any prior travel to the United States or any connections to the country—other than with

---

[6] Although in this section the Court limits itself to the allegations in the complaint, the
Court observes that the Rahmanis also do not state anywhere in their preliminary injunction
declarations that they or their immediate family members wish to enter the United States.

the United States military's engagement in Afghanistan—such that the Court could generously infer that travel plans might be forthcoming.  Instead, the Rahmanis assert they have suffered a reputational injury stemming from the stigma of State's Section 7031(c) designation and the corresponding announcement, which says that the Rahmanis were designated because of "their involvement in significant corruption."  Compl. ¶¶ 10, 45; *see* U.S. Dep't of State, Leveraging Tools to Promote Accountability and Counter Global Corruption (Dec. 11, 2023), https://www.state.gov/leveraging-tools-to-promote-accountability-and-counter-global-corruption/ (last accessed Apr. 18, 2024).

The problem, then, is that the remedy the Rahmanis seek would not redress their alleged injury.  Plaintiffs argue in Counts II and IV that the Section 7031(c) designations are unlawful because the Rahmanis are former government officials who fall outside the scope of the statute, which they argue only applies to current government officials.  Even assuming arguendo that the Court agreed with the Rahmani's argument, a decision from the Court endorsing Plaintiffs' position would do nothing to contradict the factual basis of State's public assessment that the Rahmanis have been involved with significant corruption.  It would also do nothing to counter the basis of the closely related OFAC SDN designations and the alleged reputational damage from the OFAC Press Release.  Nor would it redress any of the corresponding injuries to the image of the Rahmanis.  Indeed, the only decision from the Court that would address the Rahmanis' reputational injury from State's designations would be one that sides with Plaintiffs' Count V—that the State designations and OFAC designations are not supported by sufficient evidence.[7]

---

[7] An additional hypothetical may serve to illustrate the redressability issue.  The only scenario where Counts II and IV could impact the Rahmanis' reputation is one in which the Court ruled favorably on those counts and unfavorably on Count V.  But in that situation, the

Therefore, given that the Rahmanis only allege reputational injuries from State, the reversal of their Section 7031(c) designations because of an issue of statutory construction would not do anything to redress those injuries.  As alleged in the complaint, it is not the fact that the Rahmanis are presumptively ineligible to enter the United States that damages them.  It is the reason *why* they are ineligible that causes harm, as told to the public by State's announcement of the Section 7031(c) designations.  The Rahmanis cannot put the cat back in the bag: they can only improve their reputation by establishing that State was factually incorrect, or at least without adequate support for the designations.  That means the Rahmanis' injury is not "likely to be redressed by judicial decision" on Counts II and IV.  *Sierra Club*, 755 F.3d at 973. Consequently, the Rahmanis have failed to meet the "irreducible constitutional minimum" of standing for Counts II and IV, *Lujan,* 504 U.S. at 560–61, and the Court will dismiss those counts.

### 2.   Count V Against State Is Not Reviewable

The Supreme Court "ha[s] long recognized the power to . . . exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control."  *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (citation omitted); *see also Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (stating that Congress and the Executive control "the admission and exclusion of foreign nationals").  Immigration policy and the decision to admit or exclude aliens implicate "the conduct of foreign relations, the war power, and the maintenance of a republican form of government."  *Harisiades v. Shaughnessy*, 342 U.S. 580,

---

Court's conclusions on Count V—that the State and OFAC designations were supported by sufficient evidence—would lend even greater credence to the accusations of corruption, making it unlikely that the Rahmanis could receive any reputational benefit from the reversal of the Section 7031(c) designations on an issue of statutory construction.

588–89 (1952).  Thus, "it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950).  Following from these general principles, the D.C. Circuit has set forth the doctrine of consular nonreviewability, which "prevent[s] a federal court from second-guessing a United States consular officer's decision to issue or withhold a visa." *Baan Rao Thai Rest.*, 985 F.3d at 1023; *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1162–63 (D.C. Cir. 1999) (same).

Here, Defendants heavily rely on *Bautista-Rosario v. Mnuchin*, 568 F. Supp. 3d 1 (D.D.C. 2021), where the court found a designation under Section 7031(c) to be nonreviewable based on the doctrine of consular nonreviewability.  *Id.* at 6–7.  That court noted that without "affirmative congressional authorization, judicial review of an alien's exclusion is ordinarily unavailable."  *Id.* at 6.  It continued by explaining that "while Section 7031(c) designations are not merely visa denials or revocations, Plaintiffs have pointed to no . . . statute specifically authorizing judicial review of the designations."  *Id.*  Therefore, "[j]ust as the Court of Appeals has 'infer[red] that the immigration laws preclude judicial review of consular visa decisions' under the APA . . . so too [the district court] conclude[d] the immigration laws preclude judicial review of Section 7031(c) designations."  *Id.* (quoting *Saavedra Bruno*, 197 F.3d at 1162).

Under Plaintiffs' view, Defendants' reliance on *Bautista-Rosario* is misguided for two main reasons.  First, Plaintiffs say that "the issue in this case is whether § 7031(c) applies to persons who were not government officials at the time of their designation, not merely whether there was a correct application of § 7031(c) to a person undeniably subject to the statute."  Pls.' PI Reply at 18.  But this argument goes to whether State had the authority to designate the Rahmanis in the first place, issues raised in Counts II and IV, and as the Court explained above,

Plaintiffs lack standing to challenge State's designation authority.  Second, Plaintiffs say that sanctions imposed under Sanction 7031(c) are separate from—and should be treated differently than—determinations made in the consular review process, and that there has been no consular decision on whether the Rahmanis can enter the United States.  Pls.' Opp'n MTD at 28.

The Court agrees that the doctrine of consular nonreviewability is not an exact match here.  Be that as it may, *Bautista-Rosario* did not directly rest on that doctrine, nor do Defendants.  The consular nonreviewability doctrine reflects the basic separation of powers principle that the political branches are best suited to make determinations regarding foreign affairs, including the exclusion of aliens: the type of decision relevant to this action.  Consider the effect of a Section 7031(c) designation.  As explained above, the only legal effect of that decision is to preclude the Rahmanis from entry to the United States.  That effect is quite similar to a consular official's decision whether to allow a foreign national entry into the United States.

Defendants also rely on a sealed judicial opinion from the Eastern District of New York that reached an identical conclusion as the *Bautista-Rosario* court with respect to Section 7031(c)—in a case involving an individual who, at the time he was designated, was a former government official.  Defendants have provided a redacted version of that opinion.  *See Sealed v. Pompeo*, No. 20-cv-01087 (E.D.N.Y. Jul. 22, 2022), Mem. Op. and Order, Defs.' MTD Reply, Ex. A, ECF 27-1 (the "*Sealed Case*").[8]  That court held that "[t]he language of § 7031(c) unambiguously demonstrates Congress's decision to exclude the courts from cases concerning

---

[8] Plaintiffs object to Defendants' citation to the *Sealed Case*, arguing that "presenting a redacted memorandum from a sealed case under a sealed docket denies Plaintiffs any opportunity to obtain an understanding of either the facts and circumstances underlying the State Department's designation in that case or the arguments made by the parties."  Pls.' Sur-reply MTD at 3.  The Court, however, is comfortable that the redacted memorandum provides enough information to understand the legal and factual context of the *Sealed Case*, and to find its persuasive value applicable to this action.

the admission of foreign officials with links to 'significant corruption.'" *Id.* at 2.  It continued by explaining that:

> The non-reviewability of alien designation and exclusion is well established. Indeed, Congress has expressly prohibited judicial review of visa denials and revocations—actions with much the same effect as § 7031(c) designations.  The language of § 7031 gives the Secretary of State the sole authority to determine whether an official has engaged in "significant corruption" and the ability to subsequently find that an official has become eligible again because of changed circumstances.  Without any statutory or regulatory limitation, and outside of a removal proceeding, there is no law to apply to the Secretary's discretionary actions and the subsequent visa revocation.  Thus, the immigration laws preclude judicial review of § 7031(c) designations.

*Id.* at 5.

The Court finds the reasoning in *Bautista-Rosario* and the *Sealed Case* to be persuasive, and adopts it here.  Because "Congress has expressly prohibited judicial review of visa denials and revocations," *Bautista-Rosario*, 568 F. Supp. 3d at 7, and a Section 7031(c) designation has essentially the same effect but is issued at a higher level, the Court concludes that Section 7031(c) designations are not subject to judicial review.  This conclusion is also consistent with *Nkrumah v. Pompeo*, a case involving 22 U.S.C. § 288e(b), which authorizes the Secretary of State to determine that "the continued presence" in the United States of certain foreign visa holders "is not desirable," causing the revocation of the visa.  No. 20-cv-01892 (RJL), 2020 WL 6270754, at *1, 3 (D.D.C. Oct. 26, 2020).  Adjudicating a challenge to such a determination, the court held that it is "not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien.'" *Nkrumah*, 2020 WL 6270754 at *2 (quoting *Saavedra Bruno,* 197 F.3d at 1159).  That holding closely matches the Court's conclusion in the present case, where State's Section 7031(c) designations exclude the Rahmanis and the Rahmanis have not identified any express authorization to review that determination.

Nevertheless, Plaintiffs insist that the cases discussed above are applicable to their challenge because Plaintiffs are arguing that the Rahmanis do not fall within the purview of the statute.  In *Bautista-Rosario*, 568 F. Supp. 3d at 7 and in *Nkrumah*, 2020 WL 6270754 at *2, the respective plaintiffs undisputedly fell within the class of persons subject to the application of Section 7031(c) and 22 U.S.C. § 288e(b).  And "while the sealed plaintiff in the *Sealed Case* may have been a former government official at the time of his designation, unlike here, he apparently did not raise an *ultra vires* challenge to that exercise of authority," and the court did not consider that issue.  Pls.' Sur-reply MTD at 5.  The Court has already explained why this argument is self-defeating because it has dismissed Counts II and Counts IV (which raise the ultra vires argument) for lack of standing.  To redress the Rahmanis' reputational injuries, Plaintiffs would have to persuade the Court that State's designations were not supported by an accurate or sufficient factual basis.  Arguing that the Rahmanis are simply not covered by the statute does nothing to solve their justiciability problem.  If anything, it makes it worse.

In summary, "this Court concludes the immigration laws preclude judicial review of Section 7031(c) designations."[9]  *Bautista-Rosario*, 568 F. Supp. 3d at 7.  The Court will grant the motion to dismiss Count V as it relates to the State Department.  The Court next turns to Count V as it pertains to OFAC, which Defendants have not moved to dismiss.

## C.  Plaintiffs Are Unlikely to Succeed on Their Arbitrary and Capricious Claim Against the Treasury Defendants

Plaintiffs argue in Count V, against the Treasury Defendants, that OFAC's "imposition of sanctions on Plaintiffs was based on conclusory allegations, failed to identify any credible

---

[9] Because the Rahmanis lack standing to bring Counts II and IV, the Court may not, and does not, reach the merits of the Rahmanis' argument that Section 7031(c) designations are inapplicable to former government officials.

evidence, was contrary to fact, and is, therefore, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law." Compl. ¶ 100.  Put another way, the inquiry here looks to the substance of OFAC's designations and whether they are supported by a sufficient factual basis.  Given the considerable deference owed to OFAC as an agency decisionmaker taking action that implicates foreign relations, the Court concludes that Plaintiffs have not demonstrated that they are likely to succeed on this claim.

### 1.   APA and Deference to Agency Decisions

As a general matter, courts uphold agency action unless the agency's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  This standard is deferential, and a court reviews only whether the agency decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  Therefore, an agency's decision may be deemed arbitrary and capricious where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The Court may not "substitute its judgment for that of the agency."  *Id.*; *see also, e.g., Epsilon Elecs., Inc. v. OFAC*, 857 F.3d 913, 925 (D.C. Cir. 2017) (concluding that evidence supported OFAC findings).

The Court accordingly must determine whether OFAC's decision is supported by "substantial evidence."  *Islamic Am. Relief Agency*, 477 F.3d at 733 (concluding that the "district court applied the proper standard" when district found "substantial evidence" to support OFAC's

designation).  Moreover, the general deference owed to agencies is heightened in the context of

foreign affairs and national security.  *Id.* at 734.  The D.C. Circuit has emphasized that a court's

review "in an area at the intersection of national security, foreign policy, and administrative

law," as is true here, is "extremely deferential."  *Id.*  Indeed, courts in this district frequently

emphasize the deferential nature of reviewing economic sanctions.  *See, e.g., Olenga*, 507 F.

Supp. 3d at 280 ("The D.C. Circuit has shown extreme deference to blocking orders, which fall

at the intersection of national security, foreign policy, and administrative law.") (internal

quotation marks and citation omitted); *Zevallos v. Obama*, 10 F. Supp. 3d 111, 119 (D.D.C.

2014) (same); *Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 155

(D.D.C. 2010) (same).  Thus, OFAC is due considerable deference on its decision to issue

sanctions on Plaintiffs.  *See Islamic Am. Relief Agency,* 477 F.3d at 733 (upholding OFAC

designation even when evidence was "not overwhelming")*; see Epsilon Elecs*. 857 F.3d at 925

(noting, on review of an OFAC designation, that the "APA's substantial evidence standard

'requires more than a scintilla, but can be satisfied by something less than a preponderance of the

evidence.'") (quoting *Town of Barnstable v. FAA*, 740 F.3d 681, 687 (D.C. Cir. 2014)).

   2.  Plaintiffs Are Unlikely to Succeed in Showing That OFAC's Decision is Arbitrary and
Capricious

      *a.  Defendants' Ex Parte, In Camera Submission and Plaintiffs' Motion to Strike*

         As an initial matter, the Court must address the limited evidence available at this

juncture.  Because Plaintiffs seek injunctive relief on a short timeline, Defendants have not yet

provided the administrative record, nor have they offered supporting declarations.  Before

providing the Court and the parties with the administrative record, OFAC must first coordinate

within the Executive Branch to redact any classified or other protected information.  Thus, the

only publicly available documents supporting OFAC's designations are the initial OFAC Press

Release and concurrent State announcement.  Conversely, both Rahmanis have offered

declarations, including a supplemental declaration from A. Rahmani, that contest the accuracy of

the OFAC press release.  Normally, this lopsided presentation of evidence might compel a

determination in favor of the Plaintiffs.

      However, Defendants have provided OFAC's classified evidentiary memorandum

supporting the designations to the Court for *ex parte*, *in camera*, review.  IEEPA expressly

provides for such a submission:

> In any judicial review of a determination made under this section, if the
> determination was based on classified information (as defined in section 1(a) of
> the Classified Information Procedures Act) such information may be submitted to
> the reviewing court *ex parte* and *in camera*.

50 U.S.C. § 1702(c).  Accordingly, "where an OFAC determination is supported by classified

information, the D.C. Circuit has 'authorized' use of an alternative process of judicial review that

provides the designee with notice and an opportunity to be heard but permits OFAC to submit

the classified material to the court *ex parte* and *in camera*."  *Olenga*, 507 F. Supp. 3d at 277

(citing *Fares v. Smith*, 901 F.3d 315, 318 (D.C. Cir. 2018)); *see also Holy Land*, 333 F.3d at

163–64 (concluding that IEEPA provides for *ex parte*, *in camera*, review of classified

information).

      When using IEEPA's *ex parte*, *in camera*, review process, OFAC has sometimes

provided unclassified summaries of the classified portions of the administrative record.  *See id.*;

*Basengezi*, 2024 WL 1050340, at *11 ("OFAC would have made things easier for [the plaintiff]

if it had provided unclassified summaries of the classified portions of the administrative record,

as it has done in many cases before courts in this district.").  Such a summary, or indeed any part

of the administrative record other than the OFAC Press Release and State announcement, has not

been made available publicly or to the Plaintiffs.  But the OFAC Press Release does spell out the

nature of OFAC's allegations in detail, giving Plaintiffs the "'who,' 'what,' 'when' and 'where' of the allegations" underlying OFAC's decision.[10]  *Fares*, 901 F.3d at 324 (quoting *Kiareldeen v. Ashcroft*, 273 F.3d 542, 548 (3d Cir. 2001)).

So while the Court understands that Plaintiffs have not been able to see the information in the administrative record, the terms of IEEPA and "the overriding governmental interest at stake in protecting classified information and the wide berth afforded the executive branch in matters relating to foreign affairs and national security," *Olenga*, 507 F. Supp. 3d at 278, permit the Court to consider Defendants' *ex parte* submission, *see also Bello v. Gacki*, 94 F.4th 1067, 1075 (D.C. Cir. 2024) ("[T]he government—namely, the Executive Branch—has a critical interest in protecting classified, privileged and law enforcement information.").  Furthermore, there will be an opportunity for Plaintiffs to review the administrative record (although likely not all classified information therein) at the summary judgment stage, which will proceed on an expedited basis.

Plaintiffs concede that IEEPA authorizes Defendants to submit classified information to the Court, but they object to the timing of Defendants' submission as a violation of the scheduling order in this case, Local Civil Rule 65.1(c), and Federal Rule of Civil Procedure 6(b).  *See* Pls.' Reply Mot. Strike at 2–4.  The Court disagrees, has already reviewed Defendants' submission, and will consider it in resolving the motion for a preliminary injunction.  Plaintiffs are correct that Defendants would have been much wiser to state that they intended to rely on an *ex parte*, *in camera*, submission when they first filed their opposition to the motion for a preliminary injunction, rather than waiting until oral argument.  Still, at that hearing, Defendants'

---

[10] Much of the caselaw on *ex parte* and *in camera* review pursuant to IEEPA looks to whether OFAC's practices are consistent with due process.  *See, e.g., Fares*, 901 F.3d at 324; *Olenga*, 507 F. Supp. 3d at 277; *Basengezi*, 2024 WL 1050340, at *11.  Plaintiffs do not raise due process claims in this action.

counsel represented that they could provide the evidentiary memorandum to the Court within a week, and Plaintiffs did not expressly object at that time.  Trans. of Prelim. Inj. Hr'g at 22:4–18, 35:22–25, 57:6–11, ECF No. 25.  At most, Plaintiffs' counsel "encourage[d] the Court" to "ignore" citations outside of the record that had been submitted up to that point.  *Id.* at 51:22–25.

Therefore, although the Court did not expressly authorize Defendants to submit the memorandum, the Court's silence reflects the fact that Plaintiffs did not raise the issue.  In any event, if Plaintiffs' concerns had been brought more clearly at the time, the Court would have granted Defendants' permission to file the notice of lodging and the evidentiary memorandum as part of their opposition to the preliminary injunction.  Given that IEEPA expressly provides for this type of review, that Plaintiffs seek an order from the Court on a short timeframe, and that Plaintiffs ask the Court to enjoin an executive branch decision that is owed significant deference, the Court will not ignore the information that Defendants now offer.

Additionally, Defendants' notice of lodging does not violate Local Civil Rule 65.1(c), which provides that preliminary injunction oppositions "shall be accompanied by all affidavits on which the defendant intends to rely" and "[s]upplemental affidavits either to the application or the opposition may be filed only with permission of the Court."  LCvR 65.1(c).  The notice of lodging, although supported by a declaration attesting that the evidentiary memorandum is a true, complete, and genuine copy, is not itself an affidavit supporting Defendants' opposition.  For the same reason, Defendants' submission does not violate the scheduling order or Fed. R. Civ. P. 6(b).  None of these rules or schedules bear on when IEEPA *ex parte*, *in camera*, review is appropriate.  The Court reiterates that Defendants should have been quicker and more transparent about presenting the evidentiary basis for their opposition to the motion.  But at this point in time, the Court will not look the other way, and consequently denies Plaintiffs' motion to strike.

The Court will move on to discussing how Defendants' *ex parte*, *in camera*, submission affects their opposition to Plaintiffs' preliminary injunction motion.

   b. *Defendants Have Presented Substantial Evidence Supporting the OFAC Designations*

      At this stage, the Court concludes that OFAC is likely to demonstrate that its designations were supported by substantial evidence, and that Plaintiffs have not shown a likelihood of success on the merits.  The Court's *in camera* review of the evidentiary memorandum confirms that OFAC has evidence supporting the detailed allegations in the Press Release.  To reiterate, that Press Release lays out a four-part scheme of public corruption by the Rahmanis, including fuel contract inflation, import tax fraud, fuel theft, and parliamentary election corruption.  *See* Press Release.  OFAC's memorandum describes specific corrupt acts that are supported with dates and numbers, including collusion on fuel prices in 2014, import tax fraud in multiple years in the latter half of the 2010s, non-delivery of 11 million liters of fuel, and $1.6 million in bribes to Afghan election officials.  *Id.*  While OFAC must offer supporting documentation for these claims at summary judgment, the evidentiary memorandum indicates that the administrative record will contain sufficient proof to provide a substantial basis for OFAC's designations.

      Plaintiffs argue that the allegations in the Press Release are "false."  Pls.' PI Mot. at 32, 34.  At the outset, they contend that M. Rahmani "had no relationship with, ownership interest in, or control over any business involved in contracting with the U.S. Government, the Afghan Government, or any other government."  *Id.* at 34; *see* M. Rahmani Decl. ¶¶ 27, 30–31, 33, 44–47.  Thus, they object to the conflation of M. Rahmani with his son A. Rahmani into "the Rahmanis," because he was not involved with A. Rahmani's companies.  *See* Pls.' PI Mot. at 34; M. Rahmani Decl ¶¶ 27, 33.  But more directly, Plaintiffs also assert that the claims concerning A. Rahmani and his companies are not true.

According to Plaintiffs, A. Rahmani's fuel contracts with the U.S. military were "completed successfully" and without concerns raised by any U.S. contracting authority. A. Rahmani Decl. ¶ 11. Plaintiffs recount a history where A. Rahmani's companies started supplying fuel in 2013, and then fuel procurement responsibility switched from the U.S. Army to the Afghan Government, leading to a controversy where several other Afghan fuel companies complained that the contracting process was tainted. *Id.* ¶ 13. Then, one of A. Rahmani's companies was awarded a bridge contract for fuel that was eventually extended through other contracts until February 10, 2017. *Id.* ¶¶ 16–20. Plaintiffs allege the U.S. commended the company for its performance, *id.* ¶ 19, and that at one point the company paid more in custom tax than necessary because the Afghan government did not process its tax exemptions in time, *id.* ¶ 20. Plaintiffs say that A. Rahmani's companies did not participate in fuel contracts after 2017. *Id.* ¶ 21. They assert that "[a]t no point were the Rahmanis involved in the alleged inflation of fuel contract prices, fraudulent importation of fuel, fraudulent use of Maffinama certificates, or fuel contract bid- rigging." Pls.' PI Mot. at 37; *see* M. Rahmani Decl. ¶¶ 27, 44–47; A. Rahmani Decl. ¶¶ 49(b)-(g). Furthermore, they also contend that neither Rahmani had any direct or indirect ownership or control over the entities named in OFAC's Press Release as having bribed personnel to conceal non-delivery of fuel. M. Rahmani Decl. ¶¶ 27, 47; A. Rahmani Decl. ¶¶ 27, 49(h)-(i).

In addition, Plaintiffs say that the allegations of parliamentary corruption are false and that the Rahmanis' campaigns fully complied with Afghan law. M. Rahmani Decl. ¶¶ 19, 48; A. Rahmani Decl. ¶¶ 43, 45–46, 49(j). And while the Press Release connects the Rahmanis' efforts to obtain citizenship by investment with their alleged network of corruption, Plaintiffs answer that the Rahmanis had legitimate reasons related to the safety of their family members, and say

that the Press Release never alleges that the Rahmanis obtained their citizenships in St. Kitts & Nevis and Cyprus illegally.  M. Rahmani Decl. ¶¶ 36–39, 49; A. Rahmani Decl. ¶¶ 51–54.

In short, Plaintiffs primarily contest OFAC's assertions by offering the Rahmanis' word that the allegations in the Press Release are false, and that OFAC severely misapprehends the nature of the Rahmanis' business interests.  The only independent basis supporting their statements is a German court decision that found a newspaper could not rely on OFAC's press release to make corruption claims about Plaintiffs.  *See* Pls.' PI Mot., Ex. 4, ECF No. 11-5.  But this foreign court decision on the limits of permissible journalism practices has no bearing on whether OFAC's determinations were supported by the information available to the agency.  *See, e.g., Fulmen*, 547 F. Supp. 3d at 24 (stating that EU ruling was irrelevant to propriety of OFAC designation decision).  Otherwise, as Defendants note, Plaintiffs do not offer other documentary evidence that substantiate the claim that M. Rahmani was not involved with A. Rahmani's companies, or that the companies withdrew from fuel contracts business in Afghanistan after 2017.  Considering that Plaintiffs argue that OFAC's designation is either fictitious or based on a gravely mistaken view of the facts, they have not introduced the evidence required to support those arguments and to rebut OFAC's conclusions.

The Court's determination here is further supported by comparison to its decisions in *Xiaomi Corp. v. Department of Defense*, No. 21-cv-280 (RC), 2021 WL 950144 (D.D.C. Mar. 12, 2021), and *Luokung Technology Corp. v. Department of Defense*, 538 F. Supp. 3d 174 (D.D.C. 2021).  In both cases, the Court granted preliminary injunctions enjoining economic sanctions under IEEPA.[11]  *Xiaomi,* 2021 WL 950144 at *1; *Luokung*, 538 F. Supp. at 174.  In

---

[11] More specifically, the sanctions were imposed by the Department of Defense pursuant to Section 1237 of the National Defense Authorization Act for Fiscal Year 1999, Pub. L. 105-261, 112 Stat. 2160 (Oct. 17, 1998) (as amended), which authorized the President to exercise

*Xiaomi,* the Court found that the designation lacked substantial evidence because it was supported only by a two page decision that relied on just two "generally innocuous facts" found in Xiaomi's own public annual report, one of which the plaintiffs' rebutted with documentary evidence. 2021 WL 950144 at *8, 12. And in *Luokung,* the designation relied on "five total pieces of evidence in its Decision Memo—all of which are public, non-classified data seemingly pulled from general news articles or Luokung's own company website." 538 F. Supp. 3d at 188. Notably, the Court observed that the government did not "rely on any additional evidentiary basis—such as classified information—to support Luokung's … designation." *Id.* at 188 n.9.

Here, OFAC is on stronger ground than in *Xiaomi* and *Luokung*. The Press Release is significantly more detailed than the documents in both those cases and features specific allegations of wrongdoing rather than relying on inferences from public facts. More importantly, Defendants *have* offered an additional evidentiary basis of classified information to support the Press Release and the designation. Even though Plaintiffs' supporting declarations also quite specifically contradict the Press Release, they will still have to prove that their conclusions are more accurate than the findings of the U.S. government. Therefore, in light of the Press Release, the Court's *ex parte* review of classified information, and the considerable deference owed in this context, the Court finds that there is substantial evidence to support OFAC's designations, at this early stage.

Because that also means that Plaintiffs have not shown "a likelihood of success on the merits," the Court "may deny [the] motion for preliminary injunction, without further inquiry." *Standing Rock Sioux Tribe,* 205 F. Supp. 3d at 26. The Court need not consider whether

---

IEEPA authority and impose sanctions on "Communist Chinese military compan[ies]." *Xiaomi,* 2021 WL 950144 at *1; *Luokung,* 538 F. Supp. at 174.

Plaintiffs have sufficiently presented proof of irreparable injury or shown that an injunction is in the public interest.  *See Ark. Dairy Co-op Ass'n, Inc*, 573 F.3d at 832 (stating that "[the] [c]ourt need not proceed to review the other three preliminary injunction factors" where plaintiffs have "shown no likelihood of success").  Consequently, based on its assessment of the first factor and Count V against the Treasury Defendants, the Court concludes that a preliminary injunction is not an appropriate exercise of its discretion here.  Plaintiff's motion for a preliminary injunction is also moot as to the other counts, which have been dismissed.

## V.  CONCLUSION

For the foregoing reasons, Defendant's partial motion to dismiss (ECF No. 17) is **GRANTED**, Plaintiffs' motion for a preliminary injunction (ECF No. 11) is **DENIED**, and Plaintiffs' motion to strike (ECF No. 24) is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  April 19, 2024                                           RUDOLPH CONTRERAS
                                                                United States District Judge