**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MIR RAHMAN RAHMANI *et al.*,

       *Plaintiffs*,

   v.

JANET YELLEN,
Secretary of U.S. Department
of the Treasury, *et al.*,

       *Defendants*.

Civil Action No. 1:24-cv-00285 (RC)

**CONSOLIDATED BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND REPLY BRIEF IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

ARGUMENT .......................................................................................................................1

I.    Plaintiffs Err in Relying on Extra-Record Evidence, None of Which Shows They
      Are Entitled to Summary Judgment...................................................................................1

II.   Plaintiffs Fail to Show that OFAC's Decision to Designate Them Was Arbitrary
      and Capricious ...................................................................................................................5

      A.    The Investigation of the Stuttgart, Germany Prosecutor's Office Is
            Immaterial to OFAC's Designations .......................................................................5

      B.    OFAC Properly Relied on SIGAR Source Information ........................................6

      C.    OFAC Properly Designated Fidelis and Secure, Neither of Which Are
            Plaintiffs in this Case. ..........................................................................................10

      D.    OFAC Properly Designated Plaintiffs Based on Specific Evidence that
            They Engaged in Parliamentary Corruption ..........................................................15

      E.    OFAC Properly Designated Plaintiffs Based on Specific Evidence that
            They Engaged in Fuel Theft ..................................................................................18

III.  Nothing Supports Plaintiffs' Already-Rejected Argument that Their Designations
      Lack a Legal Basis...........................................................................................................21

IV.   Plaintiffs Concede that the Non-Afghan Entities Are Properly Designated Based
      on A. Rahmani's Ownership or Control ..........................................................................22

V.    The Administrative Record Contains Substantial Evidence that the Rahmanis
      Engaged in Election Corruption.......................................................................................22

VI.   Plaintiffs' Belated Notice Arguments Fail Under the APA..............................................23

CONCLUSION...................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Basengezi v. Smith*,
  No. CV 23-1249 (JEB), 2024 WL 1050340 (D.D.C. Mar. 11, 2024) ..........................7, 15, 23

*Bazzi v. Gacki*,
  No. 19-CV-484 (RDM), 2020 WL 5653599 (D.D.C. Sept. 23, 2020) ......................................2

*Butte Cnty., Cal. v. Chaudhuri*,
  887 F.3d 501 (D.C. Cir. 2018)...................................................................................................4

*Defs. of Wildlife v. Jewell*,
  Civ. Action No. 13-0919 (RC), 2014 WL 9883926 (D.D.C. Mar. 20, 2014)............................4

*Deripaska v. Mnuchin*,
  No. 19-cv-00727 (APM), 2020 WL 7828783 (D.D.C. Dec. 29, 2020) ....................................3

*Epsilon Elecs., Inc. v. U.S. Dep't of Treasury, OFAC*,
  857 F.3d 913 (D.C. Cir. 2017)...............................................................................................12

*Fares v. Smith*,
  901 F.3d 315 (D.C. Cir. 2018).........................................................................................23, 24

*Fulmen Co. v. OFAC*,
  547 F. Supp. 3d 13 (D.D.C. 2020)...............................................................................5, 7, 20

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010).....................................................................................................................8, 16

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
  219 F. Supp. 2d 57 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003)..........................8, 16

*In re 650 Fifth Ave.*,
  No. 08 CIV. 10934 KBF, 2013 WL 2451067 (S.D.N.Y. June 6, 2013)..................................12

*Jordan v. District of Columbia*,
  161 F. Supp. 3d 45 (D.D.C. 2016)............................................................................................24

*Kadi v. Geithner*,
  42 F. Supp. 3d 1 (D.D.C. 2012)............................................................................................5, 9

*Karadzic v. Gacki*,
  602 F. Supp. 3d 103 (D.D.C. 2022).......................................................................................5, 8

*López Bello v. Smith*,
  651 F. Supp. 3d 20 (D.D.C. 2022)...............................................................8, 9, 16, 21, 25

*Oceana, Inc. v. Pritzker*,
  24 F. Supp. 3d 49 (D.D.C. 2014) ........................................................................22

*Olenga v. Gacki*,
  507 F. Supp. 3d 260 (D.D.C. 2020) ................................................7, 15, 16, 24, 25

*People's Mojahedin Org. of Iran v. U.S. Dep't of State*,
  182 F.3d 17 (D.C. Cir. 1999) .............................................................................24

*Quick v. U.S. Dep't of Com., Nat. Inst. of Standards,*
  *& Tech.*, 775 F. Supp. 2d 174 (D.D.C. 2011) .......................................................24

*Rakhimov v. Gacki*,
  Civ. Action No. 19-2554 (JEB), 2020 WL 1911561 (D.D.C. Apr. 20, 2020) .....................2, 25

*Reinhard v. Johnson*,
  209 F. Supp. 3d 207 (D.D.C. 2016) ....................................................................13

*Theodore Roosevelt Conservation Partnership v. Salazar*,
  616 F.3d 497 (D.C. Cir. 2010) ...........................................................................2, 3

*Zevallos v. Obama*,
  10 F. Supp. 3d 111 (D.D.C. 2014) ...............................................................4, 16, 21

**INTRODUCTION**

Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Cross-Motion for Summary Judgment ("Pls.' MSJ Mem.") confirms that the Court should grant Defendants' motion for summary judgment on Count V, the sole remaining claim in this case.  Plaintiffs' arguments are all without merit.  As a threshold matter, Plaintiffs contravene the fundamental Administrative Procedure Act ("APA") principle of record review by contesting their designations using extra-record exhibits, none of which, in any event, address the robust evidence that the Rahmanis engaged in a slew of corrupt conduct.  Plaintiffs' specific challenges to the bases for OFAC's decision fare no better.  Plaintiffs' attacks on the evidence of fuel- and-parliament-related corruption all lack record support and amount to second-guesses of OFAC's credibility determinations.  Settled law forecloses such attacks.  Finally, Plaintiffs' attempts to relitigate OFAC's legal authority and belatedly raise a notice claim are foreclosed by the Court's prior opinion and irrelevant to the sole inquiry at summary judgment: whether Plaintiffs' designations are supported by substantial evidence.  They are.  Accordingly, the Court should grant Defendants' motion for summary judgment and deny Plaintiffs' motion.

**ARGUMENT**

**I.      Plaintiffs Err in Relying on Extra-Record Evidence, None of Which Shows They Are Entitled to Summary Judgment**

Throughout their summary judgment brief, Plaintiffs inappropriately rely on more than a dozen accompanying exhibits to contest the bases for their designations.  These extra-record materials are not properly before the Court.  As Defendants have already explained at length, it is black-letter administrative law that the APA generally limits judicial review to the administrative record and prevents consideration of materials not before the agency when it rendered its decision.  *See* Defs.' Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. J. 41-43, ECF No. 41-1 ("Defs.'

MSJ Mem.") (relying on, *inter alia*, *Bazzi v. Gacki*, No. 19-CV-484 (RDM), 2020 WL 5653599, at \*6 (D.D.C. Sept. 23, 2020), which explains that "record review" is a "foundational tenet" and that plaintiffs must request reconsideration and allow OFAC "in the first instance" "to consider the [new] information (and to issue a written decision) in the usual course," "before seeking to expand the record on judicial review of OFAC's decision" (emphasis omitted)); Defs.' Opp. to Pls.' Mot. for a Prelim. Inj. 36–37, ECF No. 18.[1]

Plaintiffs fail to heed this elementary APA principle of record review, and they do not provide *any* basis for why they should be allowed to attach extra-record documents that OFAC did not have when designating Plaintiffs.  Plaintiffs quote *Theodore Roosevelt Conservation Partnership v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010), for the proposition that the Court may consider extra-record evidence when there has been a "strong showing of bad faith or improper behavior or when the record is so bare that it prevents effective judicial review," Pls.' MSJ Mem. 23 (quotation marks omitted); *see also* Defs.' MSJ Mem. 42 (same), but they do not, and cannot, make such a showing.  They do not argue bad faith or improper behavior, instead simply arguing—in conclusory fashion—that the record here is "barren with respect to issues such as M. Rahmani's connection to any of the sanctioned entities" and the Rahmanis' alleged "parliamentary corruption."  Pls.' MSJ Mem. 23.  Both contentions are wrong.  *See* Defs.' MSJ Mem. 31–32 (explaining record basis for parliamentary corruption), 33–34 (explaining record basis for M.

---

[1] It is precisely because of this foundational principle that individuals often first petition OFAC for administrative reconsideration before suing.  Doing so provides them the avenue to go beyond the original administrative record, supply evidence that they believe undermines the basis for their designations or demonstrates changed circumstances, and, if they prove unsuccessful in the administrative process, have the Court consider their new evidence as part of the new record in a lawsuit challenging OFAC's petition decision.  *See, e.g.*, *Rakhimov v. Gacki*, Civ. Action No. 19-2554 (JEB), 2020 WL 1911561, at \*6 (D.D.C. Apr. 20, 2020); *Bazzi*, 2020 WL 5653599, at \*6.  Plaintiffs here chose to go to Court without waiting for OFAC to render a decision on their delisting petition; their decision to do so is not a reason to go outside of the record.

Rahmani's designation).  They also are irrelevant—they are arguments that discrete agency factual determinations lacked evidence and were arbitrary and capricious, not arguments that the record as a whole is so sparse that judicial review is effectively impossible.

Plaintiffs never attempt to show, as they must, that the record is so inadequate that it must be supplemented.  Any such attempt would necessarily fail since OFAC's detailed evidentiary memoranda and dozens of supporting exhibits robustly justify its designations.  Under similar circumstances, the *Theodore Roosevelt* court rejected plaintiffs' efforts there to depart from the "general rule" of record review in APA cases, 616 F.3d at 514, as have other courts when evaluating plaintiffs' motions to supplement OFAC records, *see, e.g.*, *Deripaska v. Mnuchin*, No. 19-cv-00727 (APM), 2020 WL 7828783, at *6 (D.D.C. Dec. 29, 2020) (rejecting supplementation because record made "evident" that "OFAC has provided the basis for its decision").[2]

Foundational and procedural infirmities aside, Plaintiffs' efforts to introduce extra-record materials fail to move the needle.  The Court has already determined that OFAC's evidentiary memorandum reflects specific evidence supporting the detailed corruption allegations in the agency's press release and indicates that the full administrative record will provide a substantial basis for the designations.  *See* Mem. Op. 39, ECF No. 33 ("Op.").  The full record confirms the Court's preliminary assessment, as it contains considerable evidence of contract fraud, fuel theft, import tax fraud, and parliamentary corruption.  *See* Defs.' MSJ Mem. 20–24.  And none of Plaintiffs' exhibits undercut this robust record evidence.

None of Plaintiffs' exhibits even address, much less specifically contest, the particular record evidence that OFAC considered regarding the Rahmanis' corrupt acts.

---

[2] Plaintiffs also did not even move to supplement the record beforehand—a procedural error that doubly dooms their efforts to depart from ordinary APA record review.

- Five of the exhibits are news articles and public statements, including an apparent translation of a speech by M. Rahmani,[3] that just generally discuss Afghan elections and politics and in no way discuss the specific instances of electoral bribery and parliamentary corruption considered by OFAC.  *See* Pls.' MSJ Mem., Exs. H–J, L–M, ECF Nos. 45-9–45-11, 45-13–45-14.

- Another is an email that Plaintiffs' counsel solicited from an Afghan former official, which likewise comments on the Rahmanis' parliamentary elections without any consideration of the specific bribery evidence OFAC considered.  *See id.*, Ex. K, ECF No. 45-12.

- Four other exhibits are miscellaneous correspondences that simply concern fuel procurement delivery logistics and in no way address or rebut the specific record evidence of fuel theft.  *See id.*, Exs. F, N–P, ECF Nos. 45-7, 45-15–45-17.

- Two exhibits are from prosecutors in Afghanistan and Germany—the former of which offers a legal analysis that has nothing to do with Plaintiffs, and the latter of which announced only that German authorities had determined that the Rahmanis' German real-estate investments did not stem from illicit funds, and thus in no way absolved the Rahmanis of their Afghanistan-based corruption.  *See id.*, Exs. E, G, ECF Nos. 45-6, 45-8; *see also id.* at 24.

- Finally, the remaining four exhibits concern Secure and Fidelis, *see id.*, Exs. A–D, ECF Nos. 45-2–45-5, which are not Plaintiffs in this case and whose ownership or control by A. Rahmani is, in any event, supported by evidence from SIGAR, *see* Defs.' MSJ Mem. 12–14, 24–26.

And even if any of the exhibits could have some probative value (which they do not), they nonetheless fail to undermine OFAC's designations.  The Court's role is not to consider the evidence and issues *de novo*, assess the validity of Plaintiffs' conflicting views regarding the record, or come to its own conclusions on factual disagreements.  *See, e.g.*, *Zevallos v. Obama*, 10 F. Supp. 3d 111, 119, 123 n.9 (D.D.C. 2014), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015); *cf. Butte Cnty.*,

---

[3] None of Plaintiffs' exhibits are authenticated, and Defendants have not yet had an opportunity to fully review these materials as part of the delisting process.  So, Defendants have not yet made any conclusions about the exhibits' veracity, and Defendants reserve judgment on how they should be considered as part of OFAC's holistic consideration of Plaintiffs' delisting petitions.  Nonetheless, the exhibits are not properly before the Court and do not undermine OFAC's decisions to designate Plaintiffs based on the robust record before the agency.  Defendants do not separately move to strike these exhibits so as to prevent an "unnecessary and inefficient use of judicial resources"; the Court may, as it has done previously, simply disregard the exhibits.  *Defs. of Wildlife v. Jewell*, Civ. Action No. 13-0919 (RC), 2014 WL 9883926, at *1 (D.D.C. Mar. 20, 2014).

*Cal. v. Chaudhuri*, 887 F.3d 501, 506 (D.C. Cir. 2018) ("[E]ven if a party seeks to rely on evidence conflicting directly with an agency decision, we will not invalidate the decision as arbitrary and capricious based on the evidence if it was not in the record at the time of the decision" (quotation marks omitted)).  Rather, the Court's role is to determine whether OFAC reached a reasonable result based on the record before the agency.  *See Karadzic v. Gacki*, 602 F. Supp. 3d 103, 109–10 (D.D.C. 2022); Defs.' MSJ Mem. 18–19.  Here, OFAC's designations of Plaintiffs were reasonable and adequately supported.  Plaintiffs fail to show otherwise.

## II.    Plaintiffs Fail to Show that OFAC's Decision to Designate Them Was Arbitrary and Capricious

### A.    The Investigation of the Stuttgart, Germany Prosecutor's Office Is Immaterial to OFAC's Designations

Plaintiffs first mistakenly contend that the decision of the Stuttgart, Germany public prosecutor's office to drop an investigation into money laundering by A. Rahmani demonstrates his innocence from OFAC's findings of corruption.  *See* Pls.' MSJ Mem. 24–25.  This argument fails on the law and the facts.  As a matter of law, the determinations of foreign bodies to prosecute or not prosecute persons have no bearing on whether OFAC's decisions to sanction those persons were supported by the record before it.  *See, e.g.*, *Fulmen Co. v. OFAC*, 547 F. Supp. 3d 13, 24 (D.D.C. 2020) ("OFAC is certainly not bound by other countries' decisions . . . .  It is tasked with protecting the national security, foreign policy, and economic interests of the United States, and it is entitled to make its decisions based on the record before it" (citations omitted)); *Kadi v. Geithner*, 42 F. Supp. 3d 1, 13 (D.D.C. 2012) ("[T]he Court would . . . be reluctant to rely on the decisions of other countries based on information that likely differed from the administrative record compiled by and available to OFAC.").  The Court already applied this exact principle to reject Plaintiffs' prior efforts to rely on another German regional judicial decision (a Hamburg

court's decision to enjoin and fine a newspaper that relied on OFAC's press release to make claims about the Rahmanis' corruption).  *See* Op. 41 (explaining, citing *Fulmen*, that the Hamburg court's decision "has no bearing on whether OFAC's determinations were supported by the information available to the agency"); Defs.' MSJ Mem. 38–39.  Plaintiffs offer no reason why the new German decision that they identify should be treated any differently.

As a factual matter, the decision of the Stuttgart prosecutor's office to drop its investigation of A. Rahmani does not undermine OFAC's determination to sanction him and his father.  OFAC reached this decision based on credible record evidence that the Rahmanis engaged in fuel procurement and parliamentary corruption.  The Stuttgart prosecutor's decision does not exculpate the Rahmanis from this sanctionable wrongdoing.  The prosecutor determined only that it lacked "sufficient evidence" that the Rahmanis engaged in money laundering by using German companies to invest "illicit" funds—suspected to originate from fraud and bribery perpetrated during the Afghanistan war—in "high-value real estate across [Germany]."  Pls.' MSJ Mem. 24, Ex. G at 2.  In other words, the German prosecutor determined simply that it did not have clear evidence that the Rahmanis' German investments via German companies had an illicit origin in violation of German law.  It did not determine that the Rahmanis' *Afghanistan* fuel procurement and electoral activities were all above-board.  Nor did it in any way determine that *OFAC*, based on the full array of information in the record, lacked a reasoned basis and substantial evidence for its determinations that the Rahmanis' Afghanistan-based activities—none of which have a nexus to German funds, companies, or investments—warranted sanctions based in U.S. law.

### B.     OFAC Properly Relied on SIGAR Source Information

Plaintiffs further err in attacking OFAC for relying on materials from SIGAR's investigation into their corrupt activities.  OFAC permissibly relied on SIGAR's investigative

reports and expert assessment of fuel contracting issues in Afghanistan.  *See* Defs.' MSJ Mem. 40–41 (relying on, *inter alia*, *Basengezi v. Smith*, No. CV 23-1249 (JEB), 2024 WL 1050340, at *7 (D.D.C. Mar. 11, 2024), *appeal filed sub nom*. No. 24-5130 (D.C. Cir. May, 14 2024)). Plaintiffs nonetheless fault OFAC for relying on "patently unreliable" "unsworn statements from Sources of Information ('SOI')" in the SIGAR reports, and for doing so wholesale, "without any sign of critical analysis or judgment."  Pls.' MSJ Mem. 25.  Both of these arguments fail.

For one, "there is nothing suspect about OFAC's relying on" unsworn SOI statements in the reports.  *Basengezi*, 2024 WL 1050340, at *7.   "The Government may rely on a range of materials . . . including intelligence data, hearsay declarations, unverified open source materials like news media reports, and even its own press release[s]."  *Id.* (quotation marks omitted); *see also, e.g.*, Defs.' MSJ Mem. 40.  And "[i]t most certainly may . . . rely upon" source information cultivated by SIGAR, as obtaining evidence on waste, fraud, and abuse related to US-funded programs and operations in Afghanistan "fall[s] within [the investigative entity's] bailiwick." *Basengezi*, 2024 WL 1050340, at *7 (collecting cases).  The Court therefore must defer to OFAC's decision to rely on this source reporting as credible evidence of corruption; Plaintiffs' contrary views on the reliability of this evidence are speculative and immaterial in any event.  *See, e.g.*, *Olenga v. Gacki*, 507 F. Supp. 3d 260, 282 (D.D.C. 2020) (court "must defer to OFAC's resolution of which pieces of evidence were most credible and convincing"); *Fulmen*, 547 F. Supp. 3d at 25 (rejecting, based on "well-established precedent," plaintiff's attack that OFAC impermissibly relied on purportedly unreliable blogs); Defs.' MSJ Mem. 30.

For another, OFAC's reliance on SOI statements obtained by SIGAR was not wholesale or unreasoned.  The record demonstrates that OFAC carefully considered each SOI's background and determined based on its review that each source had the placement and access to report on the

information they provided.  *See* A.R. at 32–46 (various footnotes discuss each SOI), 160–64

(OFAC sanctions investigator requested and received information from SIGAR special agent

regarding the placement and access of the 19 SOIs that informed SIGAR's reports).  The

"provision of such information supports OFAC's consideration of their statements."  *Holy Land*

*Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 73 n.27 (D.D.C. 2002), *aff'd*, 333 F.3d

156 (D.C. Cir. 2003).  Moreover, the SIGAR reports were substantial and mutually reinforcing,

with several SIGAR SOIs with different placements and access independently describing

instances of the Rahmanis' corruption, and this reporting dovetailed with other evidence of

corruption, from non-SIGAR sources, that OFAC also relied on.  *See*, *e.g.*, Defs.' MSJ Mem. 21–

23.  That too supports OFAC's logical consideration of the SOI statements.  *See, e.g.*, *López Bello*

*v. Smith*, 651 F. Supp. 3d 20, 32–33 (D.D.C. 2022) (similar), *aff'd sub nom. Bello v. Gacki*, 94

F.4th 1067 (D.C. Cir. 2024).  And the record demonstrates that OFAC carefully sifted through the

various bits of SIGAR- and non-SIGAR-derived evidence to piece together for itself Plaintiffs'

"complex" and multi-step "procurement corruption scheme."  A.R. at 21; *see id.* at 21–22

(describing the four key steps: contract inflation, import tax fraud, fuel theft, and parliamentary

corruption), 33–38 (piecing together these four key steps for A. Rahmani).  OFAC's reasoned

decisionmaking requires deference, and it further forecloses Plaintiffs' attempts to challenge

OFAC's reliance on SIGAR SOI statements.  *See, e.g.*, *Holder v. Humanitarian L. Project*, 561

U.S. 1, 33–34 (2010) ("[W]hen it comes to collecting evidence and drawing factual inferences in

this area, the lack of competence on the part of the courts is marked, . . . and respect for the

Government's conclusions is appropriate." (quotation marks and citations omitted)); *Karadzic*,

602 F. Supp. 3d at 114 ("OFAC assembled sufficient evidence . . . and . . . scrutinized that

evidence. That is all the law requires of it.").

Plaintiffs' nitpicking of certain SOIs also misses the mark.  Sanctions are appropriately evaluated based on "the evidence in the record as a whole," not "singling out" individual "piece[s] of evidence" and "considering" each piece's "individual sufficiency."  *López Bello*, 651 F. Supp. 3d at 32 (quotation marks omitted) (relying on *Kadi*, 42 F. Supp. 3d. at 17, 23).  Here, Plaintiffs' sanctions rest on a bevy of evidence (that the Court has already preliminary deemed to be sufficient) and thus do not depend on any individual SOI—let alone the few that Plaintiffs attempt to discredit.  *See* Pls.' MSJ Mem. 10–15, 26–27, 31 (critiquing SOI #'s 1, 2, 8, 12, 15).  And those attempts not only invite the Court to exceed its proper role (*i.e.*, considering, in view of the totality of evidence and the heightened deference owed to OFAC's credibility and factual determinations in this national security and foreign affairs arena, whether the agency acted with a rational basis), *see* Defs.' MSJ Mem. 18–19, 30–31, but also fail on their own terms.

Take SOI #15, for example—the single SOI that Plaintiffs home in on to specifically discuss the apparent "flaws" in the SIGAR information upon which OFAC relied.  Pls.' MSJ Mem. 25–26.  SOI #15 was an Afghan government employee specifically involved in monitoring gas and oil imports, and he asserted that one of A. Rahmani's companies, Fidelis, illegally "imported an additional 2,500 metric tons . . . of tax-free [aviation] fuel" in 2019, after it had been blacklisted by the Afghan government and had its contract cancelled.  A.R. at 38 (relying on *id.* at 262–64).  Plaintiffs contend, however, that their Exhibit F—apparent correspondences regarding Fidelis deliveries—demonstrates that SOI #15's allegations were both "false" and improperly "assisted by" a "competitor to private fuel importers" with no role in tax-exemption issues.  Pls.' MSJ Mem. 26.  Setting aside that Exhibit F is not properly before the Court, *supra* at 1–3, it does not aid Plaintiffs' dual attacks.  Nowhere does Exhibit F's unverified email chain seem to support Plaintiffs' argument that SOI #15 got it wrong because the tax-fraud "issue was entirely a

misunderstanding on the part of the Afghan Government officials" and "appears" to have been "resolved months later." *See id.* at 15–16.  (Plaintiffs do not cite or quote any part of Exhibit F to support their apparent speculation, *see id.* at 15–16, 26; what is not speculation, though, is SOI #15's specific description of the illegal importation of 2,500 tons of tax-free fuel, which Exhibit F in fact confirms, *see id.*, Ex. F at 15–16.)  Nor does Exhibit F indicate that SOI #15 obtained knowledge of the tax fraud through an entity that had a conflict of interest and no access to this information, rather than through the SOI's own work monitoring gas and oil imports, as the SIGAR reporting indicated.  *See* A.R. at 164, 262–64.  (Again, Plaintiffs do not cite or quote any part of Exhibit F to support their theory of a conflict of interest and lack of personal knowledge.)

At any rate, Plaintiffs' efforts to remove SOI #15 from the equation do nothing to undermine their designations and exculpate them.  SOI #15's information was just one of several pieces of evidence demonstrating tax fraud, and his reporting stands separately from the other indicia of different types of corruption related to the Rahmanis (*i.e.*, contract fraud, fuel theft, and parliamentary corruption) that OFAC also considered.  *See* Defs.' MSJ Mem. 21–23, 41.

### C.    OFAC Properly Designated Fidelis and Secure, Neither of Which Are Plaintiffs in this Case.

Plaintiffs next unpersuasively argue that "OFAC's conclusion . . . that A. Rahmani owned or controlled Fidelis and Secure is wrong and based on fundamentally flawed . . . assumptions." Pls.' MSJ Mem. 27.  Plaintiffs' own arguments, which rely on extra-record documents like a litigation declaration and unauthenticated business records, *see id.* at 4–9, 27, are fundamentally flawed for three independent reasons.  *First*, as discussed, Plaintiffs cannot rely on extra-record documents that the agency did not have before it when designating them—even ones that they believe untether A. Rahmani from Fidelis and Secure.  *See supra* at 1–3; Defs.' MSJ Mem. 41–43.  *Second*, untethering A. Rahmani from Fidelis and Secure does not aid A. Rahmani in

contesting his designation.  His designation does not depend on the designations of the two companies, neither of which are even plaintiffs, but instead turns on his own corrupt conduct.  *See* Defs.' MSJ Mem. 20–26; A.R. at 32–38.  And many pieces of evidence that OFAC relied on to designate A. Rahmani, including all the evidence of contract fraud and parliamentary corruption and much of the evidence of tax fraud, are not tied specifically to Fidelis and Secure, and instead apply *across* his business activities.  *See* Defs.' MSJ Mem. 23; A.R. at 32–38.  (So too for M. Rahmani, who OFAC designated solely for his parliamentary corruption.  *See* Defs.' MSJ Mem. 22, 33–34.)  In other words, the Court need not wade into Plaintiffs' Fidelis- and-Secure-related arguments at all.  They are immaterial; even if true, Plaintiffs' designations remain supported by substantial evidence.

*Third*, Plaintiffs' arguments fail on their own terms.  Plaintiffs' exhibits do not undermine the reasonableness of OFAC's conclusion at the time of designation, based on the record then before the agency, that A. Rahmani owns or controls Fidelis and Secure.  *See* Defs.' MSJ Mem. 24–26, A.R. at 44–46.

OFAC's determination regarding Fidelis was reasonable despite Plaintiffs' three Fidelis-related exhibits—Fidelis business records listing Fazal Haq as company president and shareholder; a 2015 revocation of the 2014 power of attorney ("POA") that Mr. Haq granted A. Rahmani over the company; and a June 2024 declaration from Mr. Haq discussing the POA and claiming that OFAC mistakenly relied on the document to conflate two distinct Fidelis entities, Mr. Haq's UAE-based Fidelis (the apparent subject of the POA) and his Afghanistan-based Fidelis (the designated entity).  *See* Pls.' MSJ Mem. 4–8 (citing relying on *id.*, Exs. A–C).  None undermines the SIGAR reporting, including from two former Fidelis employees, that led OFAC to conclude based on the record before it that A. Rahmani owns or controls the company:

- Three SIGAR reports, from March 2018, February 2021, and February 2022, which OFAC considered, rebuff Plaintiffs' use of the business records. *See* Defs.' MSJ Mem. 13, 25. The first two reports specifically identify A. Rahmani as the Fidelis owner and operator. *See id.*; A.R. at 44–45 (relying on A.R. at 179, 202). The second report is based on an interview with a prior Fidelis employee, A.R. at 161, and it notes that Mr. Haq appears on the company's business license, *id.* at 202, 208. (This is a point Plaintiffs' exhibit makes as well.) The third report is also based on an interview with another Fidelis former employee, and it likewise identifies the company as belonging to A. Rahmani. *See* Defs.' MSJ Mem. 13, 25; A.R. at 164, 194, 196–97. It also highlights how A. Rahmani listed a nominee owner on business licenses in lieu of himself. *See* Defs.' MSJ Mem. 13, 25; A.R. at 164, 194, 196–97. As reflected by the three reports, Mr. Haq's presence on the Fidelis business records, and A. Rahmani absence from those records, is something OFAC considered. It logically concluded that such "official" business information, when considered with the knowledgeable source information on A. Rahmani's power over Fidelis and modus operandi of using others in positions of official authority, "does not undermine [A. Rahmani's] control over [Fidelis]." A.R. at 45; *see* Defs.' MSJ Mem. 25.[4]

- Similarly, the apparent 2015 revocation of A. Rahmani's POA also does not undermine OFAC's assessment of his control over Fidelis. That purported revocation does nothing to negate the subsequent SIGAR reporting that OFAC considered regarding his continuing control.[5] Plaintiffs fail to even address these highly probative pieces of evidence, instead focusing myopically on the POA and falsely claiming that OFAC pinned its determination on this single document. *See* Pls.' MSJ Mem. 4–8, 27. It plainly did not.

- And Mr. Haq's June 2024 declaration likewise does not undermine OFAC's reliance on the SIGAR reporting. Mr. Haq contends that he issued A. Rahmani the POA over Fidelis-UAE, which he contends is a distinct entity from Fidelis-Afghanistan. Pls.' MSJ Mem. 7–8 (citing Ex. C, ¶¶ 4–9). Yet these unverified, post-hoc assertions[6] do not undercut

---

[4] Under a plain and ordinary meaning, individuals have "control" over entities even if they lack formal legal rights, so long as they can "exercise power or influence over" the entities. CONTROL, Black's Law Dictionary (11th ed. 2019); *cf. In re 650 Fifth Ave.*, No. 08 CIV. 10934 KBF, 2013 WL 2451067, at *6 (S.D.N.Y. June 6, 2013) (designation proper where, despite lack of legal ownership, evidence established control over activities).

[5] Plaintiffs fault OFAC for not including the POA revocation document, which Fidelis separately provided to OFAC in May 2024, as part of the agency's summary judgment submission. *See* Pls.' MSJ Mem. 8. Yet summary judgment is limited to the administrative record, and parties generally cannot introduce documents in litigation that were not before the agency at the time of its decision. And regardless of any POA revocation, A. Rahmani's broad power of attorney over Fidelis's operations for some time supports OFAC's assessment of his ownership or control over the company—especially when considered in tandem with the later SIGAR reporting.

[6] Courts routinely discount such years-after-the-fact declarations prepared for litigation. *See, e.g.*, *Epsilon Elecs., Inc. v. U.S. Dep't of Treasury, OFAC*, 857 F.3d 913, 927 n.11 (D.C. Cir. 2017);

OFAC's decision to rely on SIGAR reporting specifically identifying A. Rahmani as owning and operating Fidelis as part of fuel contracting in Afghanistan.

Based on the record before the agency at the time of designation, OFAC's determination that A. Rahmani owns or controls Secure also was reasonable, even in spite of the business record exhibit that Plaintiffs submit. That exhibit includes Secure's business license, which lists Ahmad Farhad as Secure's President, Ahmad Farhad Mazhda as the manager and sole shareholder of Secure's parent company, and the business address of the parent company as in the Ajman Free Zone. Plaintiffs claim that all of this shows that the designated Secure entity is a UAE entity that lacks a connection to A. Rahmani, contrary to the assertion of SOI #2 from the March 2018 SIGAR report. *See* Pls.' MSJ Mem. 9, 26 (relying on *id.*, Ex. D). Not so. The license information does not contradict SOI #2's specific reporting, based on his former employment at Secure, that (i) A. Rahmani owned and operated the company as part of fuel contracting in Afghanistan, and (ii) the company's business license nominee is Ahmad Farhad. *See* Defs.' MSJ Mem. 13, 25; A.R. at 45, 163, 201, 203. Plaintiffs nonetheless contend that SOI #2 "demonstrably" misidentified Secure's president, whom Plaintiffs say is Ahmad Farhad Mazhda and not Ahmad Farhad, Pls.' MSJ Mem. 9, 27, yet they fail to acknowledge that the very first page of Plaintiffs' Secure business exhibit also identifies the president as "Ahmad Farhad," *id.*, Ex. D at 1.[7] Nor, for that matter, do Plaintiffs

---

*Reinhard v. Johnson*, 209 F. Supp. 3d 207, 209 (D.D.C. 2016). The Court should do so here as well. Nowhere on the face of the POA or elsewhere in the record does there appear support for Mr. Haq's and Plaintiffs' claims that the POA (and by extension A. Rahmani's Fidelis involvement) "addresses a separate [Fidelis] company in the United Arab Emirates conducting business outside of Afghanistan." Pls.' MSJ Mem. 27. Plaintiffs' newfound arguments on the distinctions between Fidelis-UAE versus Fidelis-Afghanistan run headlong into the SIGAR reporting of A. Rahmani's involvement in fuel contracting through Fidelis in Afghanistan.

[7] Plaintiffs fault OFAC and SIGAR for not taking the "investigatory steps to obtain" or examine the Secure business records. *See* Pls.' MSJ Mem. 9, 27. But in light of the record evidence from SIGAR indicating that the business licenses for A. Rahmani's companies simply list nominees—evidence that Plaintiffs ignore—Plaintiffs' complaint rings hollow.

acknowledge the other corroborating SOIs in separate SIGAR reporting.  These other SOIs additionally reinforce the reasonableness of OFAC's assessment, based on the record before it at the time of designation, that A. Rahmani owns or controls Secure and lists false owners on his companies' business licenses.  *See* Defs.' MSJ Mem. 25–26; A.R. at 45–46 (relying on A.R. at 179, information from a former Secure employee, *id.* at 163, as well as *id.* at 194, another former Secure employee, *id.* at 163, 194).

Finally, there is no merit to Plaintiffs' accusation that OFAC did not properly consider exculpatory information already in the record.  Plaintiffs acknowledge, as they must, that OFAC did address exculpatory information: it discussed a SIGAR SOI who stated that A. Rahmani did not own or operate Fidelis or any other logistic companies, as well as two other SOIs providing similar information.  *See* Pls.' MSJ Mem. 5; Defs.' MSJ Mem. 23–24, 26; A.R. at 41–42.  But Plaintiffs contend that there are "questions as to whether OFAC actually considered [this] information" because the agency redacted the "supporting information" behind its conclusion that the SOIs did not present sufficient evidence to exculpate A. Rahmani.  Pls.' MSJ Mem. 5–6; *see also id.* at 27 (contending that OFAC "self-servingly dismissed th[e] exculpatory evidence").

The record does not support Plaintiffs' speculative accusation.  OFAC may rely on classified or otherwise privileged evidence to make sanctions determinations, and the agency may provide such protected, redacted evidence to the Court for *ex parte*, *in camera* review.  *See* Defs.' MSJ Mem. 23 n.5; Pls. MSJ Mem. 39.  A redaction does not evidence any "discounting" by OFAC.  As the Court's *ex parte*, *in camera* review will demonstrate, OFAC did in fact actually consider and logically discount the potentially exculpatory SOI information that Plaintiffs focus on.  *See* Defs.' MSJ Mem. 24; A.R. at 42 (relying on A.R. at 314, 322).  And, in any case, the redacted record available to Plaintiffs forecloses their argument as well.  *See* Defs.' MSJ Mem.

24.  It "makes clear that [OFAC] considered the competing facts," and, accordingly, "the Court

must defer to OFAC's resolution of which pieces of evidence were most credible and convincing."

*Olenga*, 507 F. Supp. 3d at 282; *see also, e.g.*, *Basengezi*, 2024 WL 1050340, at *6 (upholding

OFAC determination where "[t]here is . . . no basis for thinking that [OFAC] 'disregard[ed]

materials . . . in the administrative record'" and where agency did consider competing facts).

### D. OFAC Properly Designated Plaintiffs Based on Specific Evidence that They Engaged in Parliamentary Corruption

Plaintiffs fault OFAC for not considering "all available factors" related to its findings that

the Rahmanis engaged in parliamentary corruption. Pls.' MSJ Mem. 28.  Yet it is Plaintiffs who

once again disregard the available record evidence of corruption, and once again do so based on

extra-record materials not properly before the Court.

Plaintiffs falsely claim that the record is "devoid of any information or documents"

supporting the allegations that they paid for votes.  *Id.* at 28.  OFAC's press release describes how

both Rahmanis paid millions of dollars for votes, *see* A.R. at 23; Defs.' MSJ Mem. 22; OFAC's

evidentiary memorandum supports these allegations with (redacted) details that the Court has

previously reviewed *in camera* and confirmed, *see* A.R. at 38–39, 43–44 ; Op. 39; Defs.' MSJ

Mem. 31–32; and the full administrative record provides the (redacted) supporting documentation,

*see* A.R. at 249, 252, 255, 265–66, available in unredacted form for the Court *in camera*.

Redactions in the relevant memorandum portions and documentation to protect classified or

privileged information do not show the record is "devoid" of any supporting evidence regarding

election bribes.

Plaintiffs also wrongly claim that the record lacks any actual evidence that they engaged

in political corruption once in office.  *See* Pls.' MSJ Mem. 29.  Plaintiffs themselves acknowledge

that the record does in fact include reporting of such corruption: a SIGAR SOI—who was

employed in the fuel logistics field, had a relationship with the Rahmani family, and had previously provided information of known reliability—reported in February 2021 that the Rahmanis used their influence to block passage of the Afghan budget so as to retain control over fuel procurement contracts.  *See* Defs.' MSJ Mem. 22; A.R. at 33 & n.20, 34, 164, 179–80.  But Plaintiffs attempt to minimize this reporting by claiming it is "conclusory," "false," and "implausible."  Pls.' MSJ Mem. 29.  Those accusations fall flat.  Plaintiffs never explain what about the February 2021 SIGAR report is conclusory or wrong—nor could they, since the available portions of the report provide sufficient details regarding the Rahmanis' actions and motivations, the *ex parte* portion provides additional context, and the information comes from a reliable source with clear placement and access.  *See* A.R. at 33 & n.20, 34, 164, 179–80. Plaintiffs' criticism of OFAC for crediting the SIGAR reporting as probative information is an evidentiary quibble, amounting to a conflicting view of record material that lacks any force (especially in this foreign affairs and national security arena).  *See Zevallos*, 10 F. Supp. 3d at 119, 123 n.9; *see also, e.g.*, *Humanitarian L. Project*, 561 U.S. at 33–34; *López Bello*, 651 F. Supp. at 33; *Olenga*, 507 F. Supp. 3d at 282; *Holy Land Found. for Relief & Dev*, 219 F. Supp. 2d at 75.

The various improperly-submitted exhibits that Plaintiffs rely on likewise fail to undermine their designations for parliamentary corruption.  None rebuts—much less even addresses—the specific record evidence of bribes and improper political influence that OFAC considered.

Plaintiffs' election-related exhibits offer zero new information.  The news articles about the 2018 parliamentary elections are simply a redux of the various election facts that Plaintiffs allege in their Complaint.  *See* Pls.' MSJ Mem. 28 (relying on *id.*, Exs. H–I, ECF Nos. 45-9–45-10); Defs.' MSJ Mem. 32.  As with those alleged facts, the news articles change nothing because

OFAC determinations of electoral corruption did not hinge on outward violations of election law and public reporting on such violations, but instead concerned the Rahmanis' backdoor dealings. *See* Defs.' MSJ Mem. 31–32.  Similarly, the short U.S. Embassy public statement welcoming the parliamentary election results just restates Plaintiffs' allegations that the Rahmanis' elections outwardly complied with Afghan law and did not prompt investigation from election overseers. *See* Pls.' MSJ Mem. 28 (relying on *id.*, Ex. J); Defs.' MSJ Mem. 32.  Again, such generalized public statements do not rebut or call into question the specific evidence OFAC considered about how the Rahmanis, in deals hidden from the public, paid millions to buy votes.  *See* Defs.' MSJ Mem. 31–32.  Finally, the unverified email response from a former Afghan intelligence and security director—one that Plaintiffs' counsel solicited after Plaintiffs' designations and on the eve of this litigation—likewise fails to weaken OFAC's record evidence of election bribery.  *See* Pls.' MSJ Mem. 28–29 (relying on *id.*, Ex. K).  The official's email states only that he and his office did not receive official complaints regarding the Rahmanis' elections or find any evidence to back up the rumors of corruption purportedly spread by their political rivals.  *Id.*  Yet an Afghan government office's apparent lack of reporting or official complaints about the Rahmanis' corruption does nothing to undermine the specific intelligence on hidden election bribery, totaling millions of dollars, that OFAC had available to it.

And Plaintiffs' parliament-related exhibits and arguments are more of the same.  The article with the EU's public statements supporting the 2021 Afghan budget process does not discuss the Rahmanis, so it is no surprise that it does not call into question the SIGAR reporting on the Rahmanis' backroom efforts to block passage of the budget to protect their fuel interests. *See id.* at 29–30 (relying on *id.*, Ex. L). So too for the unverified translation of M. Rahmani's own speech rejecting accusations that he was to blame for the budget blockage, *see id.* at 30 (relying

on *id.*, Ex. M), and for Plaintiffs' contentions—untethered from any exhibits—that describe the public budget process and use these apparent facts to disclaim involvement in the budget failure, *see id.* (explaining, among other things, that the draft budget was rejected by the finance and budget committee based on as many as 19 grounds).  Plaintiffs' self-serving denials are irrelevant in light of the record evidence.

>    **E.    OFAC Properly Designated Plaintiffs Based on Specific Evidence that They Engaged in Fuel Theft**

In its press release and evidentiary memorandum, OFAC explained that it designated A. Rahmani for fuel theft based on four pieces of record evidence: (1) a February 2019 Afghan government report that Secure embezzled 3 million liters of fuel from the Afghan Army's 209th Corps; (2) a February 2022 SIGAR report that Fidelis would underdeliver fuel by 500,000 liters and keep this underdelivered amount for sale on the open market; (3) evidence that Secure bribed Afghan army personnel to conceal non-delivery of fuel and allow at least 11 million liters of fuel to go undelivered in less than a year; and (4) an August 2018 SIGAR report that Secure embezzled fuel from the Afghan Army's 201st Corps.  *See* Defs.' MSJ Mem. 9, 21–22, 33.  In response, Plaintiffs address only the first and fourth pieces of evidence, even though the other two are by themselves sufficient to support OFAC's determination that A. Rahmani engaged in fuel theft through his companies.  *See* Op. 39 (explaining that OFAC had demonstrated a likelihood of success because the agency's memorandum described specific corrupt acts, including the non-delivery of 11 million liters of fuel).  In any case, Plaintiffs' partial attack on a subset of the fuel-theft evidence also falls short on its own terms.  Their view that the February 2019 Afghan government and August 2018 SIGAR reports of fuel embezzlement is not "credible," Pls.' MSJ Mem. 31, is irrelevant under settled law, *see supra* at 7–8; Defs.' MSJ Mem. 30, and Plaintiffs are, in any case, wrong.

The record does not support Plaintiffs' scattershot attacks against the February 2019 report from the Afghan Assigned Delegation.

- Plaintiffs first attack the report because it does not represent the view of the U.S. military—the party with which Secure had contracted—and nothing in the record shows a "complaint, suspension, or any other notification" from the military about "Secure's obligations related to delivery of fuel to the 209th Corps." Pls.' MSJ Mem. 32. Yet Plaintiffs never explain why OFAC or SIGAR were limited to considering U.S. sources and could not consider a credible Afghan government source—comprised of components of the Afghan ministry of defense and specifically dispatched to investigate reported fuel embezzlement—that did in fact find fuel delivery issues. *See* A.R. at 34–35 & n.24.[8]

- Plaintiffs next contend that the report wrongly relied on Secure's "inconsistent" delivery amounts to conclude that the company embezzled fuel. Pls.' MSJ Mem. 32. They claim that any inconsistencies are explained by the fact that Secure delivered fuel based on orders that changed "from time to time," which they purport to show with an exhibit of delivery correspondences. *Id.* But this explanation ignores the actual bases for the Assigned Delegation's conclusion that Secure embezzled fuel: the delegation specifically determined that there was a 3 million-plus liter shortfall in what Secure actually delivered between March and April 2018 versus what Secure itself reported it had delivered, and the company refused to cooperate and clarify this discrepancy. *See* A.R. at 34–35, 231–33 (reporting other similar discrepancies as well). Neither Plaintiffs' exhibit nor their account of shifting orders explains away this inculpating evidence.

- Plaintiffs finally pivot to claiming that the report is "flawed" because it "did not investigate the timing of, or other explanations for[,] the alleged disappearance of fuel" or mention the Rahmanis at all. Pls.' MSJ Mem. 32–33. Neither critique is convincing. Other reporting establishes A. Rahmani's ownership or control of Secure. *See supra* at 10–15. And the Assigned Delegation's report reflects that the entity investigated delivery issues during specified time periods in 2018 and determined that Secure bore responsibility for the fuel disappearances based on a range of evidence, *e.g.*, Secure's contract; Secure's delivery practices; comparison of Secure's claimed versus actual delivery amounts using the company's delivery tickets and "certain documents concerning fuel delivery consumption . . . gathered from regional depot, garrison, command and control center, counterintelligence, and ciphers from the [209th Corps'] sites"; and Secure's refusal to clarify delivery issues. A.R. at 231–32. OFAC thus logically relied on the report—a choice that, in any event, Plaintiffs lack any legal basis to challenge.[9]

---

[8] Plaintiffs' argument is a curious one given the number of Afghan-specific sources that they cite in their efforts to persuade the Court that OFAC's designations are deficient.

[9] So too for Plaintiffs' suggestion that the validity or accuracy of the report may be in doubt. *See* Pls.' MSJ Mem. 31 n.3. Under settled law, OFAC is permitted to rely on a broad range of evidence, and the purpose of the Court's inquiry is not to second-guess these choices. *See supra*

Plaintiffs similarly offer a hodgepodge of unsupported reasons why they believe the August 2018 SIGAR reporting of fuel theft is flawed.

- Plaintiffs first claim that the SIGAR report lacks credibility because it is based on "minutes of an internal U.S. Government meeting that does not cite any other document or evidence." Pls.' MSJ Mem. 33. Yet the record exhibit is not simply meeting minutes; a SIGAR special agent attended the meeting in question and directly reported on the information obtained. *See* A.R. at 367. And the meeting was not just any "internal" meeting—it convened representatives from several U.S. military agencies to brief the commander of the Combined Security Transition Command-Afghanistan (the agency responsible for supplying fuel to Afghan forces) on criminal organizations involved in fuel theft. *Id.* at 46 n.41, 367. Plaintiffs provide no reason why OFAC should have disregarded incriminating information about Secure from this highly relevant meeting.

- Plaintiffs next claim that the August 2018 SIGAR report "contradicts" the February 2019 Assigned Delegation report. Pls.' MSJ Mem. 33. Not so. That the reports discuss two different Afghan Army Corps is not a contradiction at all, just proof that Secure embezzled fuel from *multiple* military units.

- Using an extra-record exhibit of email correspondences involving Secure,[10] Plaintiffs contend that a third-party U.S. military contractor validated all fuel deliveries by Secure and other vendors. *Id.* at 33–34 (relying on *id.*, Ex. P). They argue that this validation process meant that the U.S. "would have certainly known" about "any [fuel] manipulation . . . by Secure" and taken legal action, yet no evidence of such action exists in the record. *Id.* at 34. But the absence of third-party or U.S. evidence of or action against Secure's hidden embezzlement at the time it occurred does nothing to undermine the specific evidence of embezzlement that SIGAR and OFAC, with the benefit of time and their diligent investigations, have now uncovered from several sources.

- Finally, Plaintiffs fault the August 2018 SIGAR report for providing "conclusory" allegations regarding fuel theft. Pls.' MSJ Mem. 34. Yet the report does provide details: It discuss the "how" (Secure underdelivered on the 1.54 million liters of fuel for delivery each month to the 201st Corps and sold the embezzled fuel on the open market), the "where" (the scam involved fuel deliveries to the main corps garrison), and the "who" (Secure and Captain Esa Khan split the profits). *Id.*; *see* A.R. at 368–69. That detail is enough, especially when considered in combination with all the other corroborating evidence of fuel theft that OFAC had before it.

---

at 7–8; Defs.' MSJ Mem. 30–31. "Nothing in th[e] record" or Plaintiffs' arguments "warrants a departure from that well-established precedent," *Fulmen*, 547 F. Supp. 3d at 25, especially considering that OFAC has certified that the exhibit is a translation provided to SIGAR, *see* Certified Index 4, ECF No. 42-2.

[10] A. Rahmani disclaims any ownership or control over Secure and Fidelis but was somehow able to obtain and attach private email correspondences involving the companies. *See id.*, Exs. F, P.

In short, Plaintiffs' various disputes with fuel-theft evidence fail like their other record disputes.  They each lack support and are, in any event, inappropriate credibility challenges to discrete pieces of evidence—challenges that in no way show, as Plaintiffs must, that the record "viewed as a whole" does not "provide[] a sufficient basis to understand the OFAC's decision." *López Bello*, 651 F. Supp. 3d at 32 (quoting *Zevallos*, 10 F. Supp. 3d at 120).[11]

## III.   Nothing Supports Plaintiffs' Already-Rejected Argument that Their Designations Lack a Legal Basis

Plaintiffs improperly seek to relitigate their already-dismissed claims alleging that OFAC lacked the legal authority to designate them under the Global Magnitsky Act.  *See* Pls.' MSJ Mem. 34–37.  The Court correctly held that "IEEPA and Executive Order 13818 provide an independent basis for the sanctions imposed on the Rahmanis," regardless of the Global Magnitsky Act; it granted Defendants' motion to dismiss Counts I and III, concerning the Act; and it accordingly left Count V, concerning whether OFAC's designations are supported by substantial evidence, as the sole remaining claim for the parties to litigate at summary judgment.  Op. 26.  Plaintiffs' recycled legal authority arguments do not at all concern Count V, and they are thus irrelevant.

---

[11] These same failings foreclose Plaintiffs' attacks on two SIGAR SOIs, SOIs #1, #8, advanced only in the fact section of their brief.  Plaintiffs challenge SOI #1's reporting that A. Rahmani concealed company ownership by listing a nominee owner on business licenses.  *See* Pls.' MSJ Mem. 10–11.  They claim that "one cannot identify the owner of a company by simply looking at its business license," *id.* at 10, but that was precisely the SOI's and OFAC's point.  And Plaintiffs claim without any proof that other business records apparently demonstrate that SOIs like SOI #1 improperly attributed companies to A. Rahmani.  *Id.* at 11.  With respect to SOI #8, Plaintiffs attack his reporting in 2018 that the Rahmanis and other families colluded in meetings to drive up the price of fuel on U.S.-funded contracts and eliminate competitor bids.  Pls.' MSJ Mem. 11–15 (addressing A.R. at 222–28).  Claiming that SOI #8 made statements in 2016 that contradicted his 2018 account of the bid-rigging meetings, Plaintiffs fail to identify any such 2016 statements in the record.  *Id.* at 12–14.  And they claim that SOI #8's statements are unreliable because he could not provide certain details (such as the name A. Rahmani's representatives at the meetings), even though the source provided a detailed account of the meetings and specifically reported that A. Rahmani participated in and benefited from bid rigging "on the overall price for the fuel and who would win the bids on the individual zones."  A.R. at 224; *see id.* at 226.

IV.     **Plaintiffs Concede that the Non-Afghan Entities Are Properly Designated Based on A. Rahmani's Ownership or Control**

Both parties' briefs confirm that the designations of the 42 non-Afghan entities are supported by substantial evidence.  The parties agree that OFAC designated the 29 Plaintiff entities based on their ownership or control by A. Rahmani.  *See* Pls.' MSJ Mem. 37 ("A. Rahmani does not dispute his ownership or control over the Related Entities[.]"); Defs.' MSJ Mem. 26–29. As for the remaining 13 entities, designated on the same basis, Plaintiffs disclaim any relationship with the entities but fail to offer *any* discussion contesting the substantial corporate intelligence and other record evidence demonstrating A. Rahmani's ownership or control.  *See* Defs.' MSJ Mem. 15–16, 26–29, 39–40.   Plaintiffs thus essentially concede the propriety of the 13 designations and waive any ability to contest them.  *See, e.g.*, *Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 72 (D.D.C. 2014).   And, regardless, Plaintiffs lack standing to attack these non-party designations.  *See* Defs.' MSJ Mem. 40.

V.      **The Administrative Record Contains Substantial Evidence that the Rahmanis Engaged in Election Corruption**

Plaintiffs' return to the topic of election corruption near the end of their brief fares no better than their initial discussion.  Plaintiffs once again claim that the OFAC allegations of election bribery are "conclusory assertions."  Pls.' MSJ Mem. 38.  Plaintiffs acknowledge that there is in fact supporting record evidence, but they complain that the evidence is redacted, thus improperly depriving them of "any particularity" as to the alleged payments made.  *Id.*  Not so.  As discussed, OFAC is permitted to rely on redacted classified or otherwise privileged information, as it did here; and the evidentiary memorandum that the Court has already reviewed *in camera*, along with the complete record, substantiate the bribery allegations in OFAC's press release.  *Supra* at 15; A.R. at 23, 38–39, 43–44, 249, 252, 255, 265–66.

The press release, for that matter, is an unredacted record document that OFAC also may rely on in justifying its designations, *see, e.g.*, *Basengezi*, 2024 WL 1050340, at *7, and it too provides sufficient particularity. The Court has already recognized as much. *See* Op. 36–37 (relying on *Fares v. Smith*, 901 F.3d 315, 324 (D.C. Cir. 2018)). Contrary to Plaintiffs' contention, the document describes the "when" of the Rahmanis' bribery payments (A. Rahmani made payments "[a]head of the October 2018" election and M. Rahmani paid bribes "throughout the parliamentary speakership elections in 2018," *see* A.R. at 23), "to whom" the payments were made (A. Rahmani paid voters and some members of the Afghan Independent Election Commission, and M. Rahmani paid fellow members of parliament, *see id.*), and "other" details such as how much they paid (A. Rahmani $1.6 million to the commission, and M. Rahmani paid "millions of dollars" to parliament members, *see id.*). Pls.' MSJ Mem. 38.

Plaintiffs' "vehement and specific denials of" any election bribes do not "rebut" the specific record evidence of such bribes. *Id.* Plaintiffs rely solely on the A. Rahmani and M. Rahmani declarations that they submitted in support of their denied preliminary injunction motion, wherein the two offer their own accounts of the elections and, in conclusory fashion, deny any bribery. *Id.* at 38–39 (citing ECF Nos. 11-3, 11-4). The Court already declined to credit such self-serving and sparse extra-record evidence, *see* Op. 41, and it should do the same now.

## VI.     Plaintiffs' Belated Notice Arguments Fail Under the APA

Finally, Plaintiffs raise notice arguments that are waived, foreclosed by the Court's prior opinion, and ultimately spurious.

Plaintiffs have waived any arguments claiming that the "[l]ack of [d]etail in the Administrative Record" has deprived them of sufficient notice under the APA, because they did not plead a notice claim in their Complaint or seek to amend their Complaint to add such a claim.

Pls.' MSJ Mem. 39.  "[I]t is well settled that a plaintiff is not permitted to raise new claims at the summary judgment stage, where those claims were not pleaded in the complaint." *Jordan v. District of Columbia*, 161 F. Supp. 3d 45, 61 (D.D.C. 2016) (quotation marks omitted).  And it is likewise "axiomatic" that a plaintiff cannot, as Plaintiffs seek to do here, "amend its complaint merely by injecting new claims in the course of briefing a dispositive motion." *Quick v. U.S. Dep't of Com., Nat. Inst. of Standards & Tech.*, 775 F. Supp. 2d 174, 183 (D.D.C. 2011).

Plaintiffs' belated notice arguments further fail because the Court has already indicated that OFAC provided Plaintiffs with sufficient notice.  In denying Plaintiffs' preliminary injunction motion, the Court explained that OFAC's press release "spell[s] out the nature of OFAC's allegations in detail, giving Plaintiffs the who, what, when and where of the allegations underlying OFAC's decision." Op. 36–37 (quotation marks omitted).  And the Court's explanation directly quoted *Fares*, 901 F.3d at 324, the very case that Plaintiffs  rely on to establish the notice threshold that they believe OFAC must meet but apparently "fall[s] far short of . . . here," Pls.' MSJ Mem. 39–40.  That correct reasoning forecloses any notice argument that Plaintiffs could raise.  *See also* Defs.' MSJ Mem. 41 n.7.[12]

Unsurprisingly, then, the scattered notice arguments that Plaintiffs do raise are wholly unpersuasive.  Plaintiffs first claim that OFAC provided inadequate notice because the record

---

[12] Further foreclosing Plaintiffs' belated notice claim is that Plaintiffs do not cite to or identify any APA basis for it.  *Fares* offers them no assistance because it concerned the Fifth Amendment, not the APA.  Plaintiffs have not alleged any violation of their Fifth Amendment rights (and cannot do so since they are foreign nationals located outside the United States, *see People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999)).  Regardless, the Court has already indicated that OFAC has cleared *Fares*'s constitutional notice floor, so the agency has certainly also cleared whatever notice the APA requires.  *Cf. Olenga*, 507 F. Supp. 3d at 278 (similar).  And once Plaintiffs brough suit, OFAC provided them with the administrative record, which included all the unclassified and non-privileged documents the agency considered.  The APA does not entitle them to anything more.  *See, e.g.*, *id.*

"provides virtually no information tying M. Rahmani to any alleged" fuel procurement wrongdoing or any company.  Pls. MSJ Mem. 40.  But this argument is irrelevant because the record makes abundantly clear that OFAC designated M. Rahmani for electoral corruption, not fuel procurement activity.  *See* Defs.' MSJ Mem. 33–34.  Plaintiffs next argue that OFAC deprived them of adequate notice because the agency redacted its evidentiary basis for discounting the two SOI statements potentially disassociating A. Rahmani from Fidelis and Secure.  *See* Pls.' MSJ Mem. 40.  Yet it is well-settled that the agency may rely on redacted classified or privileged information, as it did here, *see, e.g.*, Defs.' MSJ Mem. 23 n.5, and that Plaintiffs lack any notice basis to access or challenge reliance on this protected information, *see, e.g.*, *Olenga*, 507 F. Supp. 3d at 278; *Rakhimov*, 2020 WL 1911561, at *6–*7.  These foundational principles likewise foreclose Plaintiffs' final notice argument: that the redaction of nearly all the record discussion of A. Rahmani's and M. Rahmani's election bribery leaves them with an "insufficient evidentiary basis upon which to challenge their designations."  Pls.' MSJ Mem. 40–41.  All this information is classified or privileged, and, accordingly, Plaintiffs lack any cognizable notice claim concerning it.  And, in any event, OFAC's detailed press release provides a publicly available summary of the election bribery evidence, *see* A.R. at 23, Defs.' MSJ Mem. 12, 31–32, thereby providing them with a sufficient basis to challenge these allegations, *see, e.g.*, *López Bello*, 651 F. Supp. 3d at 43 (similar).

## CONCLUSION

Substantial evidence supports OFAC's decision to designate Plaintiffs.  The Court should therefore grant the agency's summary judgment motion and deny Plaintiffs' motion.

Dated:  July 10, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

DIANE KELLEHER
Assistant Branch Director
Civil Division, Federal Programs Branch

*/s/ Yoseph T. Desta*
YOSEPH T. DESTA
ALEXANDER N. ELY
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
Phone: 202-305-3080
Fax: 202-616-8460
Email: Yoseph.T.Desta@usdoj.gov

*Counsel for Defendants*